69 N.J. Super. 479 (1961)
174 A.2d 506
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN CHIARELLO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1961.
Decided October 16, 1961.
*481 Before Judges CONFORD, FREUND and LABRECQUE.
Mr. Richard H. Thiele, Jr. (assigned counsel) argued the cause for defendant-appellant.
Mr. Michael R. Imbriani, Assistant Somerset County Prosecutor, argued the cause for plaintiff-respondent (Mr. Arthur S. Meredith, Somerset County Prosecutor, attorney).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an appeal from a conviction of the defendant for atrocious assault and battery with a dangerous weapon, contrary to N.J.S. 2A:90-1 and 2A:151-5. The defendant shot and seriously wounded Louis Walker and Roland Houle, in order, as he claims, to prevent their murdering William J. Edwards. All four were employees of Camp Harmony in Somerset County. An affray had begun among the others, who had been drinking, awakening the defendant. From his testimony, to be described later, a jury could have properly found that defendant in good faith reasonably deemed it necessary to physically disable Walker and Houle in order to save Edwards' life. But from proofs adduced as to what had transpired before defendant's attention was drawn to the melee, it might have *482 been concluded by a jury that it was not in fact necessary to shoot Walker and Houle to prevent death or serious injury to Edwards, and that Edwards himself would not in the circumstances have been justified in using such measures as a matter of self-defense.
The principal question for resolution on this appeal is the correctness of the trial court's charge to the jury that the defendant's justification in defending Edwards in the manner he did depended upon whether Edwards himself would have been legally justified, on the basis of the circumstances known to Edwards, in using the same force and violence on Walker and Houle. It is and was the defendant's position at the trial that he had the right to act upon his own reasonable judgment on the basis of the appearances as manifested to him, without imputation to him of Edwards' peculiar knowledge of the circumstances. There is no completely satisfactory appellate decision on the point in this State.
On a Sunday evening, July 31, 1960, at about 8:00 P.M., Walker, Houle and Edwards, together with Campbell and Butler, two other camp employees, were gathered in the camp's nursery to watch television and test each other's strength and skill at "Indian Wrestling," fortified by ten quarts of beer from a nearby tavern. Defendant arrived soon afterward to sell his watch to Butler, and remained to watch television and to share some of the beer. He accompanied Edwards, Houle and Walker to the Warrenville Tavern at 9:30 P.M., to obtain ten more quarts of beer, and had a drink of whiskey there. Upon their return to the nursery, defendant had another glass of beer and left to go to sleep in his cabin at about 11:00 or 11:30 P.M.
The others finished the beer and went to the tavern to continue their drinking. At about 1:00 A.M. they returned to the camp  all but Butler in a high state of alcoholic exuberance. Campbell had to be "assisted" to his room, which was in the same cottage as, and diagonally across from, the defendant's room. In Campbell's room a fight broke out *483 between Houle and Walker, on the one side, and Edwards, on the other. The casus belli is not revealed by the record. Edwards threw a wild punch through a glass pane in the door, severely lacerating his arm. The mediation efforts of the sober Butler were to no avail, the fighters spilled violently through the door, and the battle continued outside the cabin. Butler discreetly remained inside.
The defendant testified that he was awakened by the breaking glass, banging noises on the walls of the cottage, and screams, such as, "Please help, help, somebody is killing me." He arose, took his .22 rifle, inserted a loaded ramrod (magazine) into it, and went outside. According to his testimony, he shone his flashlight on the combatants, about 6-8 feet away, and witnessed the following:
"Well, the victim, Bill Edwards, was lying on the ground and Louis Walker was kneeling next to the victim choking him and Roland Houle was kicking him on the side of the head, and while he was choking him he couldn't, you know, he was straining to get his hands away from his throat. So I  the light was on when I seen it, I had the flashlight, and I told these men to stop, I yelled at them, I said, `Leave that fellow alone, you're hurting him,' and Louis Walker just kept going and Roland stopped kicking him and went to the side of Louis Walker and knelt down beside Bill Edwards and he took something from his pocket, I couldn't tell for sure, and Bill Edwards started getting all full of blood, splattered all over his chest, arms and his throat. And when I seen this, Edwards didn't move any more after that, I fired the two shots over their heads and I demanded for them to stop and they just kept going. So I fired at the both of them after the second two shots."
Four shots were fired. Three hit Walker, and one Houle. They sustained serious injuries, but both recovered.
Houle testified he remembered no part of the actual shooting episode. Walker admitted in his testimony that the three combatants wound up outside the cabin, Edwards on the ground and Walker astride him, the former shouting for help. But he said that just before the actual shooting Edwards had struck Houle and Walker had stepped forward to separate them. He then heard shots, and cried, "I've been shot." At the same moment, Houle fell and Edwards *484 began kicking him, whereupon Walker, though wounded in the skull, arm and chest, began butting Edwards' eye with his head. Then he collapsed.
Edwards testified that several sutures were required to close the tear in his lacerated arm. That injury followed a "terrific right" by Walker to Edwards' eye. After they were outside the door, Edwards testified, he "was fighting on the ground and Walker was sitting on top of [his] chest with one hand around [his] throat and [Edwards] was swinging at the same time * * *." Then came the announcement by Walker, "I'm shot," and "we stopped fighting at that time." Edwards got up and tried to hail a passing car. On cross-examination, Edwards said that although Walker was choking him, he nevertheless "hollered" at the same time. He was "very well ascared." But on redirect examination, he responded affirmatively to the question "You weren't afraid you were going to really get killed, you were going to get beat up, right?". Yet he had given a statement of contrary implication to the police.

I.
The portion of the charge of the trial court presently material, and to which defendant adequately specified his objections, was as follows:
"The defendant, while admitting the shooting, urges that his conduct was justified on the ground of defense of one William Edwards who was being assaulted. In proper circumstances, ladies and gentlemen of the jury, one may, without committing actionable assault and battery, intervene for the defense of a third person, using such means as he could employ to protect himself from a similar aggression. The doctrines, principles and rules of the right of self defense apply where a person resists an attack made in his presence on a relative, member of his family or social friends. But before one person has the right to use force in the defense or aid of another, the circumstances must be such that the person on whom the assault is being made has the right of self defense and, therefore, the right to use the same force and intervention must be necessary for the protection of the third person.
*485 I should like to treat further with that. A person may justifiably intervene in the defense of another who is in imminent danger of serious bodily injury or death. But he may do so only when the person he is aiding actually has the right himself in his own self defense to do the same act.
To exert identical force against his assailant, as the intervenor in this case, in effect the defendant Chiarello is relying on William Edwards' right of self defense. And the issue presented to you is, Did William Edwards have the right, assuming he had access to the weapon or tool, to use a deadly weapon against these two men? In answering this question you must view the situation as William Edwards knew it to be. In other words, you must treat the defendant as William Edwards' alter ego and this includes imputing to the defendant all of William Edwards' knowledge of the situation, what the defendant saw and how he interpreted what he saw. Reasonable as that interpretation may be is not important. It is the actual situation which existed between William Edwards and the others upon whom the defendant's right to intervene with a deadly weapon depend.
I should say to you too, ladies and gentlemen of the jury, that the law values human life very highly and it does not countenance mistakes by one who volunteers to intervene in such a way that he intentionally endangers life. The volunteer intervenes at his peril, and if he has misinterpreted the situation, no matter what the basis of his interpretation may be, he is criminally responsible."
The court declined to charge the following requests to charge submitted by the defendant, as he felt that he "had included the basics of such requests" within the charge as given:
"(1) If just prior to the time Houle and Walker were shot by the defendant, the defendant John Chiarello had reasonable grounds to believe and did believe that Houle and Walker were then and there about to inflict either loss of life or great bodily harm upon Edwards, the defendant Chiarello had a right to interfere by all such reasonable means as appeared necessary or apparently necessary in the circumstances including means capable of producing death or serious bodily harm. Morrison v. Commonwealth-Ky., 74 S.W. 277, 67 L.R.A. 529, 534 (1903); see 1 Rest. Torts Sec. 143 (2), 1 Harper & James on Torts 287 (1956).
(2) If Chiarello had a reasonable ground to believe that Houle and Walker intended to inflict either death or serious bodily harm on Edwards, he was justified in taking steps which were necessary or apparently necessary to stop Houle and Walker, and this is so even though Chiarello may have been mistaken as to their actual intent. *486 Annot. 67 L.R.A. 531; cf. State v. Bonfiglio, 67 N.J.L. 239 (E. & A. 1901); State v. Hipplewith, 33 N.J. 300, 316 (1960).
(3) One may justifiably intervene in the defense of any person who is in actual or apparent imminent danger of serious bodily injury or death, and, he may use such force as he has reason to believe and does believe necessary in all of the circumstances. 4 Am. Jur. 155, 152."
The clearly defined issue disclosed by the differences between the charge as given, and those requested by defendant, has split the American jurisdictions which have ruled on the matter substantially equally. The "alter ego" rule espoused here by the trial court finds expression or application in these cases. McHargue v. Commonwealth, 231 Ky. 82, 21 S.W.2d 115, 119 (Ct. App. 1929); Commonwealth v. Hounchell, 280 Ky. 217, 132 S.W.2d 921 (Ct. App. 1939); Murphy v. State, 188 Tenn. 583, 221 S.W.2d 812 (Sup. Ct. 1949); People v. Will, 79 Cal. App. 101, 248 P. 1078, 1084 (Ct. App. 1926); Moore v. State, 25 Okl. Cr. 151, 219 P. 175, 178 (Crim. App. 1923); State v. Young, 52 Or. 227, 96 P. 1067, 18 L.R.A., N.S., 688 (Sup. Ct. 1908); Humphries v. State, 28 Ala. App. 159, 181 So. 309 (Ct. App. 1938); Turner v. State, 128 Ark. 565, 195 S.W. 5 (Sup. Ct. 1917); Pacheco v. State, 96 Colo. 401, 43 P.2d 165 (Sup. Ct. 1935); State v. Francis, 152 S.C. 17, 149 S.E. 348, 70 A.L.R. 1133 (Sup. Ct. 1929). It was applied by the Essex County Court in State v. Ronnie, 41 N.J. Super. 339 (1956), on the authority of a statement in American Jurisprudence. The rule has been rationalized on the basis that to acquit a defendant who at the time of the occurrence had a reasonable belief that the seeming victim was without fault might, in instances, result in the killing of an innocent man without any criminal liability of the killer. Moore v. State, supra (219 P., at p. 178). But it has been observed, in rebuttal, that innocent men are not infrequently killed under circumstances where the law properly holds the person who caused the homicide free from criminal intent, and therefore guiltless of crime. Note: 39 Ky. L.J. 460, 462 (1951).
*487 Holding or declaring that the rescuer is not chargeable with the knowledge of the apparent victim, but is justified if it reasonably appears to him, on the basis of what he observes and knows, that the force used on the assailant is necessary to prevent death or serious bodily injury, are: State v. Mounkes, 88 Kan. 193, 127 P. 637, 639 (Sup. Ct. 1912); Parnell v. State, 50 Tex. Cr. R. 419, 98 S.W. 269 (Crim. App. 1906); Guffee v. State, 8 Tex. App. 187, 206 (Ct. App. 1880); Brannin v. State, 221 Ind. 123, 46 N.E.2d 599, 600 (Sup. Ct. 1943); State v. Menilla, 177 Iowa 283, 158 N.W. 645, 647 (Sup. Ct. 1916); People v. Dugas, 310 Ill. 291, 141 N.E. 769 (Sup. Ct. 1923); People v. Maine, 166 N.Y. 50, 59 N.E. 696 (Ct. App. 1901); People v. Young, 12 A.D.2d 262, 210 N.Y.S.2d 358 (App. Div. 1961); Willingham v. State, 72 Ga. App. 372, 33 S.E.2d 721 (Ct. App. 1945); State v. Harper, 149 Mo. 514, 51 S.W. 89 (Sup. Ct. 1899); cf. State v. Anderson, 222 N.C. 148, 22 S.E.2d 271 (Sup. Ct. 1942); Reg. v. Rose, 15 Cox's Cr. L.C. 540 (1884); Hathaway v. State, 32 Fla. 56, 13 So. 592 (Sup. Ct. 1893).
The American Law Institute rejects the "alter ego" rule as repugnant to the fundamental principle of Anglo-American criminal jurisprudence that the defendant must be shown to have a mens rea, or guilty intent. Model Penal Code, sec. 3.05(1), (Tent. Draft No. 8, 1958). Indeed, the Code goes so far as to eliminate any requirement that the actor's belief in the necessity for the use of force for the protective purpose in question be arrived at without negligence or recklessness, unless the prosecution is for an offense for which recklessness or negligence suffices to establish culpability. Sec. 3.09(2). This is on the theory that negligence is not equatable with guilty intent in relation to a crime for which mens rea must be established. The scholars in this field are not uniformly in accord that the range of immunity is, or should be, that broad. Compare Hall, Principles of Criminal Law (2d ed. 1960) pp. 366-372; Smith, "The Guilty Mind in the Criminal Law," *488 76 L.Q. Rev. 78, 98 (1960); and Williams, Criminal Law (1953), § 49, p. 163, with Sayre, "The Present Signification of Mens Rea in the Criminal Law," Harvard Legal Essays (1934) 399, at p. 403; Sayre, "Public Welfare Offenses," 33 Colum. L. Rev. 55, at p. 70 (1933); Mueller, "Mens Rea and the Law Without It," 58 W. Va. L. Rev. 34, at pp. 34, 35 (1955). See also Nord, "The Mental Element in Crime," 37 U. Det. L.J. 671, at p. 683 (1960); Note: "Justification for the Use of Force in Criminal Law," 13 Stan. L. Rev. 566, 591-598 (1961). But without exception they deprecate the imputation of criminal liability in the range of serious common-law offenses, including aggravated assault, where there is neither guilty intent nor criminal negligence. See, e.g., Sayre, "The Present Signification of Mens Rea in the Criminal Law," op. cit., supra, at p. 413; also the same writer's view in "Public Welfare Offenses," op. cit., supra (33 Colum. L. Rev., at p. 70):
"The group of offenses punishable without proof of any criminal intent must be sharply limited. The sense of justice of the community will not tolerate the infliction of punishment which is substantial upon those innocent of intentional or negligent wrongdoing; and law in the last analysis must reflect the general community sense of justice."
Burdick sums up the matter in this wise (2 Law of Crime, § 437, at pp. 136-137 (1946));
"It is, nevertheless, held in many cases that when one comes to the defense of another he stands in the same shoes as the person attacked, and that the same rules that would apply to one's own defense apply also to the defender. Consequently, it is held that a homicide is not justified in such a case if either the person defended or the defender is at fault in occasioning the difficulty; and despite the fact that a defender acts in good faith, some cases hold that he is not justified if, although unknown to him, the defended person was in fault. The more reasonable view is that one defending another in good faith and in ignorance of the other's fault is justified when acting upon reasonable appearances. While it is said that this latter rule `would allow an innocent man who had been forced to strike in self-defense, to be killed with impunity merely because appearances were against him,' yet the same objection could also be made to killing in the prevention of a forcible felony, the *489 established rule in such cases being that one is justified if he acts in good faith upon a well-grounded belief that such a felony is being attempted. Moreover, when one is apparently in immediate danger of being killed by felonious attack, if a defender before he can lawfully act must wait until he ascertains who was in fault, then innocent men will be killed for lack of defenders."
Another commonly cited objection to exculpation of the defender of a third person who kills in mistaken but honest and reasonable belief that his action is necessary to save the life of the third person, was dealt with by Professors Michael and Wechsler (Wechsler later became, and now is, Chief Reporter to the American Law Institute on the Model Penal Code) in "A Rationale of the Law of Homicide," 37 Colum. L. Rev. 701, 737 (1937). After concluding that self-defense should obviate guilt on a charge of homicide if the defendant reasonably believed he was being attacked, that his life was in peril, and that he had to kill to save himself, even if none of these hypotheses were the case in fact, the authors say:
"What has been said should suffice to cover the analogous case where homicide is believed to be necessary to save the life of some one other than the actor, were it not for one complicating factor. It may be feared that outsiders may mistake the assailed for the assailer and that it is even more likely that an outsider will misjudge the necessity than that the victim will himself. Hence, it may be argued that life is more likely to be preserved in the long run by forbidding interference entirely and leaving the victims of aggression to their own resources. But a prudent judgment about the identity of the victim must take into account the difficulties of making such judgments, particularly in the case of a scuffle; a prudent judgment about the necessity of intervening must consider that the victim may have the situation well in hand. Action which is unsupported by such judgments is imprudent and it should be sufficient to forbid imprudent intervention rather than all intervention. Moreover, a rule forbidding interference entirely would inevitably be disregarded in the case of persons whom the actor holds dear and put a premium on selfishness in other cases. And here, as elsewhere, a rule which grants exemption only if the actor was right resolves the issue only by avoiding it."
In recently arriving at the same conclusion as the scholars in the field, in a case of assault and battery, the Appellate *490 Division of the New York Supreme Court emphasized that assault and battery is a crime for which intent is an essential element, and that a mistake of fact on the part of the defendant constitutes a "negation of criminal intent." People v. Young, supra (210 N.Y.S.2d, at p. 361). There the defendant was held entitled to an acquittal on a charge of assault when he went to the aid of a strange youth who, he reasonably believed, was being unlawfully beaten by two men who were, in fact, although unknown to defendant, plainclothes police officers in the act of arresting the youth for disorderly conduct. Said Mr. Justice Breitel (210 N.Y.S.2d, at p. 364):
"Apart from history, precedents, and the language distinctions that may be found in the statutes, it stands to reason that a man should not be punished criminally for an intent crime unless he, indeed, has the intent. Where a mistake of relevant facts is involved the premises for such intent are absent. True, there are occasions in public policy and its implementation for dispensing with intent and making one responsible for one's act even without immediate or intentional fault. This is generally accomplished by statute, and generally by statute which expressly dispenses with the presence of intent. Thus, it may well be that a Legislature determine that in order to protect the police in their activities and to make it difficult to promote false defenses one may proceed against a police officer while acting in the line of duty only at one's peril, as do the English, vide supra. But this is not a part of the intent crime of assault as it existed under common law or as it exists today under the statutes."
There can be no doubt that in New Jersey assault (certainly where of an aggravated nature) is also an "intent" crime. While such intent may be sufficiently manifested by the commission of unlawful acts, State v. Adamo, 9 N.J. Super. 7 (App. Div. 1950), it is unquestionably an essential ingredient of the crime. State v. Schutte, 87 N.J.L. 15 (Sup. Ct. 1915), affirmed 88 N.J.L. 396 (E. & A. 1916).
Aside from State v. Ronnie, supra, the only discoverable precedent in New Jersey on the point here in issue is State v. Lionetti, 93 N.J.L. 24 (Sup. Ct. 1919). Carefully analyzed, it seems to us to tend to support the position here *491 advanced by the defendant. There the defendant was a wife who was convicted of manslaughter for striking the assailant of her husband with a club, the latter having gotten into a fracas with the deceased over his looking at the wife "in an improper way." The defense was justified action in defense of the husband. The conviction was reversed because of errors in the trial court's charge to the jury. As explained in the opinion:
"He [judge] charged that the jury had to consider not what she or her husband thought, but what the jurors found to be the fact, and put the specific questions: Was the husband in serious bodily danger? Was he in danger of his life? Or was he in danger of serious bodily injury to himself? The judge then added: Was her husband in such serious danger, in dire peril, at that time, or in danger of receiving serious bodily injuries, that it justified her in taking this club and using it as she did? He then charged specifically that  `If he were not in serious danger of dire peril or serious bodily danger, she had no right to do that; she had no right to use any kind of an instrument or club on this deceased, if her husband were not in that condition at that time; she had no right to do it, if her husband could with safety have retreated at that moment; and if her husband could have retreated at that moment without being in dire peril or without being in danger of serious bodily injury to himself, and if she then used that club, she should be found guilty under the law.'" (93 N.J.L., at pp. 25, 26.)
The court explained its objection to the trial charge as follows (93 N.J.L., at p. 26):
"The vice in the charge is that it leaves out of account a situation where the husband was not in fact in serious danger as the jury, in the deliberation of the trial upon evidence of all the circumstances, might find, but where the force used in defense `reasonably appeared' in the heat of the trouble to be necessary to preserve the husband's life or to protect him from serious bodily harm. State v. Bonofiglio, 67 N.J.L. 239; State v. Mount, 73 N.J.L. 582. The error was not cured by the court later in the charge telling the jury that the defendant had the right to protect her husband if they found that the facts justified her in `believing' that he was in dire peril or in danger of serious bodily harm. The two passages in the charge are inconsistent and we cannot know by which the jury was guided. This error requires a reversal." (Emphasis by the court)
*492 It would thus seem that Lionetti applies a rule of subjective intent, subject only to the qualification that defendant must be reasonable in arriving at the conclusions both that the apparent victim is in dire peril of death or serious bodily harm, and that the force he uses is necessary to protect the victim from the feared catastrophe. The reasonableness of these conclusions, however, must be adjudged by the jury on the basis of the facts known to the defendant at the time and place, not on those known only to the assailant and the victim, unless it can fairly be concluded that defendant could and reasonably should have apprised himself of those facts before acting. Cf. State v. Mount, 73 N.J.L. 582, 585-586 (E. & A. 1906); State v. Hipplewith, 33 N.J. 300, 316-317 (1960) (self-defense cases, but assimilable to defense-of-others situations; see Model Penal Code, op. cit., supra, sec. 3.09(2), treating self-defense and defense-of-others situations the same way, insofar as "reasonableness" of the defendant's beliefs is concerned, although differently from the rule as settled in New Jersey and elsewhere).
In passing, it should be noted that the comment in the Lionetti opinion (93 N.J.L., at p. 25) that "the trial judge correctly limited [the defendant's] rights to those which the husband himself had, but he stated the husband's rights too narrowly," must be understood in the context of the remainder of the opinion. This excludes the notion that defendant could be bound by the husband's peculiar knowledge, not shared by her.
The problem of justification for force exerted in defense of others is frequently studied in relation to the common-law principles that one may kill to prevent a felony or in the defense of a member of his household. See 1 Wharton, Criminal Law and Procedure, § 206, p. 453; § 218, p. 480 (1957). In this State those principles are codified by N.J.S. 2A:113-6. However, they are obviously not directly pertinent where the defensive act does not involve homicide. Moreover, our statute is not broad enough to cover defense of strangers, or, apparently, the prevention of *493 an assault, no matter how aggravated. The statute and the common-law principles, consequently, should properly be considered as generic precursors of the development of the right to use non-deadly force in defense of strangers, not as limitations, by analogy, of the scope of that principle. See Note: "Justification for the Use of Force in Criminal Law," op. cit., supra (13 Stan. L. Rev., at pp. 573 et seq.); Model Penal Code, op. cit., supra, at p. 17, comments to sec. 3.05.
The State stresses that the "alter ego" rule is the "majority rule" in this country. This may well be doubted, even if the appraisal is in number of jurisdictions expressing approval of it, as against those which condemn it. See cases cited above. As already noted, the rule is roundly rejected by substantial unanimity of the scholars in the field. Moreover, a careful reading of the so-called majority decisions shows that in many of them the issue was not sharply defined on the facts presented. As similarly analyzed in People v. Young, supra, 210 N.Y.S.2d, at p. 362, they "involve situations where the actor was present throughout, or through most, or through enough of the transaction and, therefore, was in no position to claim a mistake of fact."
The State also argues, ab inconvenienti, that admeasuring responsibility on the basis of what reasonably appeared necessary to the intervenor-defendant will unduly hamper law enforcement, since police sometimes have to function in plainclothes and might be mistaken by a well-meaning but uninformed newcomer as wrongful aggressors. The logical answer is found in People v. Young, supra, a case involving that set of facts. If public policy requires criminal sanctions against a well-intentioned but uninformed attempt to rescue a person apparently under attack by one not reasonably cognizable as, but in fact, a police officer, the Legislature can well provide therefor. English cases applying such a statute strictly against a defendant are cited in Young, 210 N.Y.S.2d, at pp. 362, 363. In the absence of such legislation, one would hardly be warranted in making a criminal out of a person selflessly attempting, without negligence, *494 to protect the victim of an apparently unjustified assault  merely because the assailants are police in disguise carrying out an arrest. Much less does the stated argument of the State justify imposing the stigma and punishment of criminality upon one who reasonably, but mistakenly, goes to the rescue of an apparent victim of assailants other than the police.
Although a wide variety of social and economic problems has impelled the adoption in this century of numerous "strict liability" penal statutes by both Congress and state legislatures, the preferred approach is that such offenses ought to be "sharply limited." Sayre, "Public Welfare Offenses," op cit., supra, 33 Colum. L. Rev., at p. 70. As quoted above from that authority, "The sense of justice of the community will not tolerate the infliction of punishment which is substantial upon those innocent of intentional or negligent wrongdoing; and law in the last analysis must reflect the general community sense of justice." Ibid. Our own Supreme Court has but recently articulated the same philosophy. In State v. Hudson County News Co., 35 N.J. 284, 293 (1961), Mr. Justice Jacobs said: "Since absolute criminal liability, such as in Halsted [Halsted v. State, 41 N.J.L. 552 (E. & A. 1879)], may harshly result in the imprisonment of persons who are not morally culpable, it has understandably received criticism in academic circles. See State v. DeMeo, supra, 20 N.J., at p. 11 [20 N.J. 1 (1955)] * * * The modern judicial trend is fortunately the other way." See also State v. Williams, 29 N.J. 27, 41 (1959); Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).
In the light of the foregoing considerations, we are satisfied that the application of sound principle in the area of crimes of assault precludes liability in the absence of either guilty intent or negligence. Consequently, we hold the charge of the trial court, in conditioning this defendant's exculpating justification for his acts upon the premise that Edwards would have been legally justified in taking *495 like defensive measures on the facts as Edwards knew them to be, rather than excusing defendant if his conduct was justified upon the basis of the facts as he reasonably concluded them to be, both in relation to the gravity of the threat to Edwards and to the extent of the force necessary to protect him therefrom, was prejudicially erroneous. This must lead to a reversal of the conviction.

II.
We turn to the State's alternative position that the defendant was so reckless in entertaining the belief that it was necessary to shoot Walker and Houle in order to save Edwards from death or serious injury, that as a matter of law he was not entitled to an instruction that he was justified in acting upon the basis of what he reasonably deemed the situation to call for. It is asserted that defendant knew the others were "drunk or high," that it was obvious they were merely "having fun," and that, "finding it a bother to inquire into the facts," defendant carelessly and ignorantly propelled four bullets into their midst.
It goes without saying that we are not called upon to express or imply our own view as to whether defendant was in fact imprudent in arriving at his conclusions as to the course of action indicated. It is only for us to determine whether a fair-minded jury could have entertained a reasonable doubt on the point from all the proofs. See IV, infra. If so, the issue was for the jury. We think this was the case here, within the substantive principles adopted in I. hereinabove.

III.
At the trial defendant unsuccessfully objected to evidence of testimony as to the developing fight between Edwards and Walker and Houle prior to the defendant's becoming apprised thereof, on the ground that his justification for his action depended upon the facts as he knew them, without *496 regard to what transpired earlier between the combatants. The State and defendant are in agreement that the correctness of the ruling depends upon resolution of the issue determined in I. hereinabove. This is clearly so. People v. Maine, 166 N.Y. 50, 59 N.E. 696 (Ct. App. 1901). The evidence objected to was inadmissible. It should be excluded at a new trial.

IV.
The conclusions in I. and III. hereinabove will require a new trial. Nevertheless, since the case must be retried, we will consider the additional ground of appeal addressed to the correctness of the charge in respect of burden of proof and to the refusal to charge defendant's request on that subject.
After defining the crime of atrocious assault and battery, and outlining the requisites for conviction, but before discussing the law relating to the defense relied upon by defendant, the court stated:
"Now, since the State has made these charges against this defendant, the State must bear the burden of proving these charges and every element thereof beyond a reasonable doubt. And that burden never shifts from the State but remains upon the State throughout the entire trial of the case. The defendant, in fact, is presumed to be innocent and that presumption remains with him throughout the entire trial of the case. As I have said, the defendant cannot be found guilty of the charge against him unless guilt be established beyond a reasonable doubt."
The court then laid down the law relative to the defense of justification, as quoted in I. hereinabove. Thereafter, after discussing the evidence and properly charging in respect of other matters, the court said:
"Now, then, with respect to your possible verdicts. The defendant is charged in two counts. If you are satisfied beyond a reasonable doubt and within the principles of law as I have outlined them to you and instructed you with, that he committed this atrocious assault and battery while armed, as charged upon each of the alleged victims, then your verdict will be guilty under the first and second *497 counts of the offense of atrocious assault and battery while armed with a dangerous weapon.
If you find that the State has borne the burden of proof beyond a reasonable doubt that the defendant has committed the offense of atrocious assault and battery against only one victim named rather than both, you will so state your findings with respect to that count in the indictment. That is to say, you find the defendant guilty of atrocious assault and battery with a dangerous weapon as charged under the first or second count, depending upon your findings.
If, on the other hand, you find that the State has not borne the burden of proof beyond a reasonable doubt that this defendant committed the offenses of atrocious assault and battery upon these persons named in the indictment, then your verdict will be not guilty. And it may be a general verdict of not guilty if you find that the State has failed to bear the burden of proof beyond a reasonable doubt."
The defendant argues error in the court's refusal to charge the following request:
"(5) I have charged you with reference to the law relating to the defendant's right to defend Edwards, and I charge you further that the burden of proof as to this issue is on the state, which must prove the defendant guilty beyond a reasonable doubt, and, accordingly, if you have a reasonable doubt as to the propriety of the defendant's asserted defense of Edwards from attack by Houle and Walker, the defendant is entitled to the benefit of that reasonable doubt and to an acquittal."
The court said, in refusing this request, as with respect to those discussed in I. hereinabove, that it had included "the basics" of the request in the charge as given.
The charge as given was not prejudicially erroneous, even if we agree that the request contained a correct statement of the law. State v. Anderson, 35 N.J. 472, 498 (1961). There, as, in effect, here, the court refused expressly to charge that the defendant was entitled to the benefit of a reasonable doubt upon the whole case including the affirmative defense (there, self-defense). Yet the Supreme Court held it was satisfied that the "substance" of the requested charge was given by the trial court's instruction, after discussion of the defense of self-defense, that "although the burden is upon the defendant to establish such a defense, the burden of proving the defendant guilty of murder, or *498 any degree thereof, beyond a reasonable doubt, is always on the State, and that burden never shifts." In the instant case, by contrast, the court at no point in its charge imposed a burden upon the defendant in respect of the defense of justification. The Anderson case is consequently authority, a fortiori, against the contention that there was reversible error in the charge as given here, even assuming the request submitted by this defendant is sound law.
Notwithstanding the foregoing, we conclude that the defendant is right insofar as his argument encompasses the proposition that where there is sufficient proof in support of the defense of justification, either in the State's case or in that submitted by the defendant, the trial court ought preferably to expressly inform the jury that it should acquit if it entertains a reasonable doubt as to whether such a defense has been made out. It is for the court in the first instance to decide whether there is sufficient proof to warrant submission of the defense to the jury. But once the issue is given to the jury the State's burden of persuasion extends to the defense as well as to the State's affirmative case.
Although there is earlier authority to the contrary of these views in this State, we find plainly adumbrated in recent decisions of the Supreme Court approval of the approach just stated, and, being convinced of its doctrinal soundness, we direct the trial court to be guided accordingly at the retrial.
It has long been fundamental that it is the obligation of the State in a criminal case to prove the guilt of the defendant on the whole case and every element of the crime by proof beyond a reasonable doubt. The burden never shifts to the defendant. 1 Wharton, Criminal Evidence (12th ed. 1955), § 10, p. 19; § 16, p. 44. But confusion of thinking or pressures of policy have obfuscated the application of that principle in relation to what are generally called affirmative defenses. McCormick has explained and commented on this situation as follows (Evidence, 1954, § 321, pp. 683-684):
*499 "There are certain excuses or justifications allowed to the defendant, which although proveable for the most part under the plea of not guilty, are spoken of for some purposes as `affirmative defenses.' Among these are self-defence, duress, insanity, intoxication and claims that the accused is within an exception or proviso in the statute defining the crime. Some courts have even so classified the defence of alibi, though analytically it seems a mere form of denial of participation in the criminal act. The older decisions and treatises placed the `burden of proof' upon matters of justification or excuse upon the accused, without discrimination between the two meanings, of producing evidence and of persuading, and many statutes still retain the form of expression. A few states as to some of these defenses actually place upon the defendant not only the burden of first producing evidence but also cast upon him the burden of persuasion by a preponderance of the evidence. This practise is most prevalent in respect to the defence of insanity, a plea which many courts evidently feel is to be disfavored on policy grounds. But as to all these claims for exoneration their truth goes in final analysis to the guilt,  to the rightness of punishing the accused. Thus it seems inconsistent to demand as to some elements of guilt, such as an act of killing, that the jury be convinced beyond a reasonable doubt, and as to others, such as duress or capacity to know right from wrong, the jury may convict though they have such doubt. Accordingly, the recent trend both in English and American decisions is to treat these so-called matters of defence as situations wherein the accused will usually have the first burden of producing evidence in order that the issue be raised and submitted to the jury, but at the close of the evidence the jury must be told that if they have a reasonable doubt of the fact on which the justification is based they must acquit."
Wharton characterizes what McCormick calls the "recent trend" in this regard as the general rule. 1 Criminal Evidence, op. cit., supra (§ 19, pp. 54-57). Putting to one side such defenses as insanity, which raise policy problems transcending normal considerations of appropriate burdens of proof by defendants in criminal cases, the widely followed rule in relation to ordinary defenses of justification like self-defense is that the jury must acquit if it has a reasonable doubt, either from the evidence submitted by the prosecution or that offered by the defendant, as to whether the accused was justified or excused, e.g., acted in self-defense. 1 Wharton, op. cit., supra, § 27, p. 81. As McCormick succinctly puts it (op. cit., supra, § 318, p. 674): "In *500 criminal cases, in modern practice, the prosecution in most jurisdictions has the burden of persuasion upon all the material facts, and even as to so-called matters of defense the accused has only a burden of producing evidence." Accord: Model Penal Code, sec. 1.13 (Tent. Draft No. 4, 1955). A recent careful evaluation of the authorities concludes that most jurisdictions consider the defendant to have satisfied his burden at the point where he introduces such evidence that he was justified in his act as places the issue of justification in doubt although it fails to persuade the jurors. Note: "Justification for the Use of Force in Criminal Law," op. cit., supra (13 Stan. L. Rev., at pp. 607, 608).
In New Jersey confusion has reigned on the point since Brown v. State, 62 N.J.L. 666 (E. & A. 1899), a homicide case. The reasoning in parts of the Brown opinion seems to reflect the philosophy that it is only the burden of coming forward with evidence supporting the defense of self-defense which devolves upon the defendant (unless such proofs appear on the State's case), and that the benefit of a reasonable doubt on the whole case goes to the defendant (pp. 704, 705). Yet the court sustained a charge wherein the jury was told: "The burden of proof of self-defense is upon the prisoner. He must show to the satisfaction of the jury a situation and circumstances under which that right may be lawfully exercised" (emphasis added), (at p. 702), and common-law authorities in support thereof were cited (at p. 704). Wigmore summarizes Brown: "(risk of non-persuasion of guilt is always on the prosecution, but the defendant has a duty to produce evidence of any justification; the opinion is not entirely clear)." 9 Wigmore, Evidence (3d ed. 1940), § 2512, p. 414. It was clear to Mr. Justice Dixon, dissenting in the Brown case, that the trial charge deprived the defendant of his right not to be convicted unless the jury were satisfied of his guilt beyond a reasonable doubt on every essential element of the crime. He said (at pp. 719, 720):
*501 "Under the circumstances admitted at this trial, the mere killing did not, as matter of law, establish any criminality in the prisoner, and therefore did not cast upon him the burden of establishing any fact to the satisfaction of the jury, in order to justify his acquittal. On the contrary, he was entitled to an acquittal, notwithstanding the killing, unless, upon the circumstances touching the legality of the arrest, or the maliciousness, wantonness, or unreasonableness of the prisoner's conduct, the jury came to an undoubting conclusion adverse to his claims. The direction to the jury, that they should convict the prisoner of murder, unless his claims on those points were substantiated to their satisfaction, was, in my opinion, erroneous.
Although, in another part of the charge, the jury were told, in general terms, to give the prisoner the benefit of reasonable doubt, yet in the explicit directions above quoted this general instruction was practically withdrawn as to all contested questions, and the starting point for the deliberation of the jury was declared to be, not a presumption of his innocence, with the burden resting on the state to prove his guilt beyond reasonable doubt, but an assumption of the prisoner's guilt of murder, with the burden resting on him to establish to the satisfaction of the jury the illegality of his arrest, and such other facts as would mitigate the offence or excuse the homicide."
The Brown case led to a crystallization of the ambivalent concept that "where the justification is self-defense, it is entirely proper to instruct the jury that the burden is on the accused of proving, to the satisfaction of the jury, a situation and circumstances under which the right of self-defense might be lawfully exercised, provided they are also instructed that the accused is entitled to the benefit of the reasonable doubt upon the whole case," State v. Jones, 71 N.J.L. 543, 547 (E. & A. 1904); and see State v. Mount, 72 N.J.L. 365, 369 (Sup. Ct. 1905). The indictment of such a charge in the dissent in Brown as, in effect, contradictory (62 N.J.L., at pp. 719, 720), seems to us well-founded. If a defendant is as a matter of law relieved of criminality where his defense is well-founded, then imposing upon him the burden of persuasion of the jury as to the merits of the defense is necessarily destructive of the universally conceded proposition that on the whole case the State must prove him guilty beyond a reasonable doubt. Obviously the "whole case" includes the defense. For an *502 excellent discussion of the principle involved see State v. Strawther, 342 Mo. 618, 116 S.W.2d 133 (Sup. Ct. 1938), included in Morgan, Maguire and Weinstein, Evidence, Cases and Materials, p. 423 (1957).
However, our present Supreme Court has recently shown unmistakable evidence of its adherence to the soundly authoritative approach that defenses of the type here under consideration impose upon the defendant, where the State has proven a prima facie case, only the duty of coming forward with evidence supportive of the defense (and that, only where no such evidence appears from the State's case). This necessarily negates the early interpretations of Brown which imposed the burden of persuasion as to the defense upon the defendant. In State v. Williams, 29 N.J. 27, 44 (1959), the Supreme Court, per the Chief Justice, said that in order for a defendant to escape the presumption from an admitted killing of murder in the second degree he was "obliged to come forward * * * with evidence of justification, excuse or mitigation unless supplied by the State's case," citing Brown, supra, and State v. Silverio, 79 N.J.L. 482 (E. & A. 1910). Here is language deliberately identifying the duty as one of coming forward with evidence, rather than of persuasion of the jury. Equivalent language was employed by Chancellor Pitney in the Silverio case, supra, 79 N.J.L., at pp. 487, 488.
And most recently, in State v. Anderson, supra, the Supreme Court clearly implied its approval of the request to charge denied by the trial court in that case: "The defendant is entitled to the benefit of a reasonable doubt upon the whole case as it goes to the jury, including the issue of self-defense" (35 N.J., at p. 498). However, as indicated hereinabove, the court deemed the substance of the request covered elsewhere in the charge.
If we accept the thesis, as this court does, for the reasons stated, that a trial court should inform the jury that it should acquit if it entertains a reasonable doubt on any element of defendant's guilt, including his defense of *503 justified use of force, there would ordinarily appear to be no sound purpose in the court's also informing the jury that the defendant has the burden of coming forward with evidence on the matter of such justification. This is a proposition of law for administration by the judge, not the jury. McCormick, Evidence, op. cit., supra (§ 307, p. 638, 639). "The shifting of the burden of evidence is governed by rules of procedure which are designed solely for the guidance of the court; with respect to their observance, operation, or effect, the jury has no function to perform." State v. Strawther, supra, 116 S.W.2d, at p. 139. Only after the judge determines that the burden of adducing evidence on an issue has been satisfied by the party to whom it has been allocated by the law does it become appropriate for the court, in charging the jury, to inform it as to which party has the burden of proof, in the sense of burden of persuasion, as to any issue, and concerning the quantum or quality of proof required to be adduced by the party in order to justify a verdict in his favor. McCormick, Evidence, op. cit., supra, at p. 639; 9 Wigmore, op. cit., supra, § 2487, pp. 278-280. See also In re Week's Estate, 29 N.J. Super. 533, 537 (App. Div. 1954); cf. Kirschbaum v. Metropolitan Life Insurance Co., 133 N.J.L. 5 (E. & A. 1945).
Thus, in specific application to a case such as the instant one, the charge, in the respects under discussion, should in substance contain a direction that in order to convict, the jury must find the defendant guilty beyond a reasonable doubt. If the defense is the justified use of force, and if the judge is satisfied from proofs submitted by either side that a fair-minded jury could properly entertain a reasonable doubt on the issue of justification, he should add to  or incorporate in  the general charge on reasonable doubt an instruction that the jury should acquit if, after consideration of all the proofs, it has a reasonable doubt as to the defendant's justification for his act, having in mind the court's specific instructions as to the legal *504 elements of the particular justification relied upon. In the condition of the proofs postulated, it would serve no proper purpose, and tend only to confuse and subvert the proper discharge of its function, to inform the jury as to the defendant's duty of coming forward with evidence as to justification.
The trial court will be guided accordingly at the trial upon the remand.
Reversed and remanded for a new trial.