421 S.E.2d 917

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Richard A. KNOTTS, Defendant Below, Appellant.**

No. 20522.

Supreme Court of Appeals of West Virginia.

Submitted April 29, 1992.

Decided July 23, 1992.

Joanna I. Tabit, Deputy Atty. Gen., Charleston, for appellee.

Daniel R. James, James E. Smith, II, Barr & James, Keyser, for appellant.

WORKMAN, Justice:

This case is before the Court upon a December 18, 1990, final order of the Circuit Court of Preston County sentencing the appellant, Richard A. Knotts, to life imprisonment without mercy. The sentence was based on a November 29, 1990, jury conviction for first degree murder. The appellant alleges that the trial court erred 1) in disallowing the appellant's and State's instructions relative to self-defense; 2) in ruling that some of the appellant's statements which were ruled inadmissible in the State's case-in-chief could be used by the State for impeachment purposes should the appellant testify; 3) in failing to strike one member of the jury panel sua sponte and two jurors challenged for cause; 4) in not granting the appellant's motion to dismiss the indictment on the ground that the prosecuting attorney impermissibly instructed the grand jury; and 5) in failing to grant the appellant's motion for judgment of acquittal on the first degree murder conviction. Upon review of the record, the briefs of the parties and all other matters submitted before the Court, we find no error was committed by the lower court and affirm the conviction.

Robert Barlow was last seen alive on the evening of February 14, 1990, by his brother Bill Barlow between 8:00 p.m. and 9:00 p.m. When Robert dropped off his brother Bill, Robert indicated that he was going to visit his girlfriend, Penny Knotts Kuhn, because it was Valentine's Day. According to Ms. Kuhn's testimony, Robert Barlow never arrived.

On that same day, the appellant had worked an evening shift from 1:30 p.m. to 9:20 p.m. as a coal truck driver for Thorn Trucking, Inc. Robert Johnson, one of appellant's co-workers, testified that after work that day he saw the appellant driving toward Tunnelton, which is in the direction of St. Joe Road. The victim's father testified that his son Robert would also have been travelling on St. Joe road en route to visit his girlfriend who resided in that area.

At approximately 10:15 p.m., a motorist, Randall Wiles, also travelling on St. Joe Road toward Tunnelton, observed a car parked on the side of the road with its hazard lights flashing. A pick-up truck was parked directly in front of the car. Mr. Wiles stopped, found the driver's side door of the automobile open, but saw no one in the area. Around 10:30 p.m., another motorist, Larry Haney, observed the same pick-up truck parked toward Route 7 near Herring Road. The pick-up truck was later identified as belonging to the victim, Robert Barlow.

Later that same night, the appellant's brother, Dale Knotts, took the appellant to the appellant's home in Masontown, West Virginia. The appellant had sustained multiple stab wounds and his girlfriend, Karen Mayfield, tried to clean the wounds. Ms. Mayfield called her son, Raymond Finn, for help. According to Mr. Finn, the appellant initially told Ms. Mayfield and Mr. Finn that he had been driving his coal truck, and had stopped when three men jumped him and stabbed him. Ms. Mayfield took the appellant to Ruby Memorial Hospital in nearby Morgantown, West Virginia.

In the early morning hours of February 15, 1990, the appellant was admitted for several hours to Ruby Memorial Hospital for the treatment of six stab wounds. The hospital then notified the Monongalia County Sheriff's Office. Sergeant Ed Pietroski was dispatched to the hospital where he interviewed the appellant. According to Sergeant Pietroski, the appellant told him that he had picked up three hitchhikers while driving his car, not his coal truck, to Osage, West Virginia, and that one of the men pulled a knife on him and stabbed him several times. Based on the information given to him by the appellant, Sergeant Pietroski went to the alleged crime scene, but found no physical evidence to corroborate the appellant's story.

Consequently, the sergeant went back to the hospital and interviewed the appellant again. The sergeant testified that the ap-

pellant seemed annoyed at having to retell his story and told the officer that "I can take care of it myself and there was no need for me [the sergeant] to go beyond what ... [I was] doing." At that point, the sergeant stated he became suspicious and turned the investigation over to Lieutenant Charlie Cira.

On the morning of February 15, 1990, Lieutenant Cira talked with the appellant. The appellant gave the officer a taped statement which was admitted in evidence and essentially recounted the statement previously given to Sergeant Pietroski.

Because the appellant's car was found in Preston County, West Virginia, and due to the fact that Lieutenant Cira found no physical evidence which indicated that the alleged assault occurred in Monongalia County, West Virginia, Lieutenant Cira testified that he believed the alleged assault took place in Preston County and accordingly advised the Preston County Sheriff's Office.

Deputy Joseph Stiles of the Preston County Sheriff's Office then began investigating the case. On February 19, 1990, Deputy Stiles stated that he went to the appellant's home to question him about the stabbing.[1] Once again the appellant told the deputy the same story he had previously relayed to Sergeant Pietroski.

During Deputy Stiles' investigation of the appellant's stabbing, he testified that he became aware of a missing person, Robert Barlow. Deputy Stiles testified that he learned that Robert Barlow's truck had been recovered on Herring Road in Preston County. The deputy visited the scene where the truck was found and made contact with Robert Barlow's family who were conducting a search of the area.

Deputy Stiles testified that Robert Barlow's body was found in the woods along St. Joe Road on February 21, 1990. Also recovered in the same vicinity were a .22 calibre pistol without the grip or butt attached, the grip of the pistol, a blue and white handkerchief, a small black strap which was a part of the victim's jacket, and an oval-shaped section of a fiber or hair. Moreover, the victim was wearing a belt with a knife case, but the knife was missing from the case, according to Deputy Stiles.

Deputy Stiles testified that on the evening of February 21, 1990, he went to the appellant's residence and asked him if he would accompany the deputy to the sheriff's office. The appellant went with the deputy where he gave another written statement[2] which was admitted in evidence at trial.[3]

According to Deputy Stiles, the appellant began his statement reaffirming his initial statement about the three hitchhikers who attacked him. Furthermore, appellant denied that he knew Robert Barlow. Deputy Stiles than asked the appellant if there was anything that he would like to add to his statement that was different from his other statements. The appellant then indicated that he wanted to tell the truth.

At this point, the appellant said that what actually happened on February 14, 1990, was that he left work around 9:20 p.m. and was driving home on St. Joe's Road when he came upon a blue Chevrolet truck with the emergency lights flashing and stopped to offer assistance. The appellant told the deputy that he met a man about midway between his car and the truck, that they exchanged names, but that he did not remember the man's name. The appellant stated that the two men talked for a couple of minutes and then the man suddenly stabbed him in the chest. The appellant stated that he then hit the man

---

1. Deputy Stiles indicated that he read the appellant his *Miranda* rights; however, the appellant waived his rights and agreed to give the deputy a statement. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. This statement was also given after the appellant was advised of and waived his *Miranda* rights.

3. The appellant also made two more statements subsequent to February 21, 1990, which were ruled inadmissible by the trial court due to a violation by the police of the prompt presentment statute. *See* W.Va.Code § 62–1–5 (1989).

and that the man may have been injured by his own knife. According to the appellant, the knife remained in the man's hand. Next, the man ran back to his truck, which was perceived by the appellant as an attempt to retrieve a gun. The man entered his truck on the driver's side and exited on the passenger's side. The appellant chased him back to the truck and according to the appellant's statement, the man swung at him again with the knife. The appellant swung back at the man and the appellant again thought the man got cut again by his own knife. The appellant's statement indicated that the appellant was unarmed during this portion of the melee.

At this point, according to appellant's statement, the man ran into the woods. The appellant chased after him. The two men fought. The appellant indicated that the man kept "sticking" him and that he in turn hit the man with "a stick or something" in the back of the head. Then the appellant stated that "I got his knife and I stuck him." The appellant's statement further revealed that when he began to leave the scene, the man "was still making noise." The appellant returned to the road, where he motioned an approaching car to keep going and not to stop. He then got into his own car and located his brother, Dale Knotts. Dale Knotts left his truck at Thorn Trucking and drove the appellant home in the appellant's car. Dale Knotts then took the appellant's car back to Thorn Trucking and drove the appellant to the hospital in his truck.

After taking this statement, Deputy Stiles testified that he continued collecting evidence from the victim's truck and the appellant's car. The appellant's blood was found in the victim's truck and on the passenger side of the appellant's car. No blood was found in Dale Knotts' truck.

Deputy Stiles' testimony also revealed that a search[4] of the appellant's parents' home uncovered a knife hidden inside of a piece of farm machinery outside the home. The name brand of the knife matched the name brand on the knife case found on the victim's body and fit perfectly into the empty case.

The connection between the appellant and the victim was brought to light by the testimony of the victim's girlfriend, Penny Kuhn. Penny Kuhn was separated from Dale Knotts, her husband and the appellant's brother, in December 1989. After the two separated, Dale Knotts made various unsuccessful attempts at reconciliation. According to Ms. Kuhn, Dale Knotts was deeply distressed over their separation and impending divorce.

During the summer of 1989, Ms. Kuhn began dating Robert Barlow's brother, Bill. After she and Bill broke up, she began dating Robert Barlow in December 1989.

On New Year's Eve, 1989, the appellant and Dale Knotts went to visit Ms. Kuhn. Knowing that she was seeing the victim Robert Barlow, the appellant warned her that if she did not reconcile with Dale, "something would happen."

Further testimony at trial included that of Dr. Carole Boyd, a pathologist at West Virginia University School of Medicine, who conducted the autopsy on Robert Barlow. Dr. Boyd testified that the victim had received at least thirty-three knife wounds, three bullet wounds on the arm and one in the head, and a contusion on the forehead from a blunt object. Further, a .22 caliber bullet was retrieved from the victim's body. Evidence showed that this bullet was fired from the pistol found at the crime scene. Finally, the pathologist's examination of the victim showed that the victim had suffered from several potentially fatal wounds, including a knife wound to the neck which fractured and injured the victim's voice box, an incision or laceration of the jugular vein, and the gunshot wound to the face.

Finally, Dr. James Lawrence Frost, a forensic pathologist, testified that he examined appellant on February 28, 1990, that none of his wounds were life threatening

**4.** Search warrants were obtained for the appellant's house, his parents' house, and his brother's trailer.

and that the anterior chest and shoulder wounds were superficial.

The appellant's defense at trial was self-defense.[5] The appellant did not testify and offered no witnesses on his behalf. His defense was asserted through the cross-examination of the State's witnesses. The appellant attempted to establish that his wounds were neither self-inflicted nor superficial. He also tried to establish that the victim was the aggressor.

The jury returned a verdict of first degree murder without a recommendation of mercy.

## I.

The first issue before the Court involves the trial court's failure to instruct the jury regarding self-defense. The appellant argues that sufficient evidence was introduced at trial to support a self-defense instruction. The State, however, argues that the appellant failed to meet his threshold burden of proving sufficient evidence of self-defense to support such an instruction.

■ In West Virginia, the law governing the use of self-defense is as follows:

a defendant who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself.

*State v. W.J.B.,* 166 W.Va. 602, 606, 276 S.E.2d 550, 553 (1981); *see Kirtley,* 252 S.E.2d at 381 n. 8; Syllabus, *State v. Green,* 157 W.Va. 1031, 206 S.E.2d 923 (1974). Further, the defendant may only use non-deadly force where he is threatened only with non-deadly force. Syl. Pt. 1, in part, *State v. Baker,* 177 W.Va. 769, 356 S.E.2d 862 (1987).

■ However, this Court also follows the common-law rule "that one who is at fault or who is the physical aggressor can

not rely on self-defense...." *State v. Smith,* 170 W.Va. 654, 656, 295 S.E.2d 820, 822 (1982); *accord State v. Asbury,* 187 W.Va. 87, 90, 415 S.E.2d 891, 894 (1992). Further, this Court has previously held that

'when there is a quarrel between two or more persons and both or all are in fault, and a combat as a result of such quarrel takes place and death ensues as a result; in order to reduce the offense to killing in self-defense, two things must appear from the evidence and circumstances in the case: first, that before the mortal shot was fired the person firing the shot declined further combat, and retreated as far as he could with safety; second, that he necessarily killed the deceased in order to preserve his own life or to protect himself from great bodily harm....'

Syl. Pt. 6, in part, *State v. Foley,* 131 W.Va. 326, 47 S.E.2d 40 (1948); *see also State v. Gibson,* 186 W.Va. 465, 472 n. 3, 413 S.E.2d 120, 126–27 n. 3 (1991); *State v. Zannino,* 129 W.Va. 775, 780, 41 S.E.2d 641, 644 (1947).

■ It is well-established that " '[i]nstructions must be based upon the evidence and an instruction which is not supported by the evidence should not be given.' " *State v. Sexton,* 176 W.Va. 595, 599, 346 S.E.2d 745, 748 (1985) (quoting Syl. Pt. 4, *State v. Collins,* 154 W.Va. 771, 180 S.E.2d 54 (1971)). Thus, before the trial court can give an instruction on self-defense, the appellant has the burden of producing sufficient evidence that the homicide resulted from the appellant acting in self-defense. This burden must also be met before the State is required to prove beyond a reasonable doubt that the appellant did not act in self-defense. *See* Syl. Pt. 6, *State v. McKinney,* 178 W.Va. 200, 358 S.E.2d 596 (1987); Syl. Pt. 4, *Kirtley,* 252 S.E.2d 374.

■ A review of the record in this case clearly reflects that the appellant did not meet his burden of proving that the homi-

**5.** The appellant also relied upon provocation, which is not a defense. Evidence of provocation can, however, result in the jury finding a lack of malice. The element of malice is essen-

tial to a first or second degree murder conviction. *See State v. Kirtley,* 162 W.Va. 249, 253–54, 252 S.E.2d 374, 376–77 (1978).

cide occurred as a result of self-defense. The only evidence which supported the appellant's self-defense theory was his own statement to Deputy Stiles wherein he stated that he had stopped to offer the victim assistance with the victim's truck and the victim, in turn, pulled a knife and stabbed the appellant. Assuming that the appellant's statement is true, when the victim first attacked him with a knife, the appellant could have legitimately reacted in self-defense. However, the facts according to the appellant's own statement indicated that after this initial attack, the victim retreated first to his own truck and then into the woods. The appellant stated that he then not only followed the victim to his truck, but continued to follow him into the woods. The appellant at this point became the physical aggressor and lost any privilege of self-defense. Moreover, the evidence established that the wounds he sustained during the struggle with the victim were not serious or life threatening.

Consequently, there was insufficient evidence to demonstrate that appellant was entitled to a self-defense instruction.[6] *See State v. Bongalis*, 180 W.Va. 584, 378 S.E.2d 449 (1989) (trial court's refusal to give self-defense instruction upheld where appellant failed to produce sufficient evidence that victim was about to inflict death or serious bodily injury to appellant); *see also Asbury*, 187 W.Va. 87, 415 S.E.2d at 891 (trial court's refusal to give self-defense instruction was affirmed where no evidence produced to show accused was threatened by victim). Accordingly, the tri-

al court committed no error in refusing to instruct the jury on self-defense.

## II.

The next assignment of error concerns the trial court's ruling that some of the appellant's statements which were ruled inadmissible in the State's case-in-chief were admissible by the State for impeachment purposes as prior inconsistent statements if the appellant testified.[7] The appellant argued that the trial court's decision concerning the admissibility of the prior inconsistent statements in reality was not limited solely to impeachment purposes,[8] swept too broadly and would have impermissibly permitted the unbridled cross-examination concerning matters which the appellant had not testified on during direct examination. Further, the appellant maintains that, because of this erroneous ruling, the trial court effectively denied the appellant the opportunity to intelligently, knowingly and voluntarily consider his constitutional right to testify. In contrast, the State contends that the trial court's decision to allow the appellant's otherwise inadmissible statements to be used for impeachment purposes was proper and did not deprive him of his constitutional right to knowingly waive his right to testify.

The resolution of this issue involves several voluntary statements which the appellant made to the police after February 21, 1990. After a suppression hearing, the trial court determined that there was probable cause to arrest the appellant on February 21, 1990, and that the appellant's prompt presentment rights pursuant to

6. Finding that the appellant's statement raised "a certain degree of provocation," the trial court did instruct the jury on manslaughter.

7. The State cross-assigned as error that the trial court erred in ruling that certain inculpatory statements made by the appellant were inadmissible during the State's case-in-chief. The statements included one taken on February 22, 1990, in which the appellant admitted that he had retrieved a .22 caliber gun from his car, shot the victim and hit him in the head with the gun. Also, on February 25, 1990, the appellant told Deputy Stiles that the victim's truck was moved to protect him. The State maintains that the appellant's prompt presentment rights were not

triggered because he was not "in custody," and that the appellant's admissions were not coerced after a prolonged interrogation. Due to the decision reached by this Court, this cross-assignment of error is moot.

8. While the appellant asserts that the trial court's ruling did not limit the admissibility of the appellant's statements to solely impeachment purposes, it is obvious from the trial court's ruling that the statements were determined admissible for the sole purpose of impeaching the appellant if he took the stand and testified inconsistently with the prior statements.

West Virginia Code § 62–1–5 (1989) [9] and West Virginia Rule of Criminal Procedure 5(a) were violated because he was not arrested until February 26, 1990. Accordingly, the trial court held that the statements made by the appellant after February 21, 1990, were inadmissible as evidence in the State's case-in-chief.

The trial court, however, during trial was asked to reconsider the admissibility of the appellant's statements upon the State's motion. Although adhering to its previous decision, the trial court concluded that if the appellant took the stand, the statements would be admissible solely for impeachment purposes and that a cautionary instruction to that effect would be given to the jury.

In syllabus point 4 of *State v. Goodmon*, 170 W.Va. 123, 290 S.E.2d 260 (1981) this Court adopted the holdings of the United States Supreme Court in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) and *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) when we held that

> [w]here a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for impeachment purposes when the accused takes the stand at his trial and offers testimony contradicting the prior voluntary statement knowing that such prior voluntary statement is inadmissible as evidence in the State's case in chief.

The facts of the *Goodmon* case involved a defendant who was questioned by the police and gave a taped statement even though he had requested an attorney and his attorney was not present during the questioning. 170 W.Va. at 126, 290 S.E.2d at 264. While the State agreed not to introduce the statement during its case-in-

chief, the prosecutor requested the court to permit the statement to be introduced as rebuttal evidence once the defendant had testified to discredit the defendant's testimony that he was threatened or coerced into giving the taped statement. *Id.* at 126–27 and 129, 290 S.E.2d at 264–65 and 267. We upheld the admissibility of the statements for the limited purposes of impeaching the defendant's testimony following the principles set forth in the *Harris* and *Hass* cases. *See* 401 U.S. 222, 91 S.Ct. 643 and 420 U.S. 714, 95 S.Ct. 1215.

Moreover, we adopted the reasoning of the United States Supreme Court in the *Harris* case for permitting the use of a defendant's otherwise inadmissible prior inconsistent statements solely for impeachment purposes. *Goodmon*, 170 W.Va. at 129, 290 S.E.2d at 267. The reasoning used by the *Harris* court was that

> [t]he impeachment process ... undoubtedly provide[s] valuable aid to the jury in assessing ... [the appellant's] credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.
>
> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.... Having voluntarily taken the stand, ... [the appellant is] under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.

401 U.S. at 225, 91 S.Ct. at 645–46 (citations omitted); *accord Goodmon*, 170 W.Va. at 129, 290 S.E.2d at 267.

---

9. West Virginia Code § 62–1–5 provides, in pertinent part, that "[a]n officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a justice [magistrate] of the county in which the arrest is made." Rule 5(a) of the West Virginia Rules of Criminal Procedure contains similar language.

■ Likewise, it logically follows that where a person accused of committing a crime makes a voluntary statement which is declared inadmissible in the State's case-in-chief due to a violation of the accused's *prompt presentment rights* pursuant to West Virginia Code § 62-1-5 and West Virginia Rule of Criminal Procedure 5(a), the statement may be admissible solely for impeachment purposes when the accused takes the stand at his trial and offers testimony inconsistent with the prior voluntary statement.

Based upon a review of the record in this case, we conclude that the trial court did not err in ruling that the appellant's prior inconsistent statements were admissible for the purpose of impeaching the appellant's testimony had he taken the witness stand.

### III.

The next issue is whether the trial court erred in failing to dismiss three members from the jury panel for cause. The appellant maintains that the trial court, sua sponte, should have dismissed Juror Shafferman for cause. The appellant also contends that upon the appellant's motion, Jurors Webster and Harrison should have been dismissed for cause. The State, however, argues that the trial court did not err in impanelling the jury. The State asserts that the appellant made no objection to Juror Shafferman and even though the trial court refused to strike Jurors Webster and Harrison for cause, these two jurors were eventually dismissed through use of the appellant's peremptory challenges.

### A.

■ The first juror at issue was Brenda Shafferman. During the initial questioning of Ms. Shafferman, she indicated that she had heard and read newspaper accounts of the crime with which the appellant was charged. Ms. Shafferman then stated that she may have some problems in laying aside the information she had gained from the newspaper and radio accounts.

Due to the juror's response, the trial court made further inquiry of the juror as follows:

Court: I had asked you, first of all, I would explain to you that you have to decide this case solely on the basis of the law and the evidence. The evidence, of course, is the testimony of the witnesses from the witness stand and any exhibits that are admitted into evidence. And I have given you some time now when you could perhaps reflect on this and that's why I have waited until now to come back. A juror should be able to sit neutrally, fairly, impartially between the State of West Virginia and Richard Knotts and render a true verdict based on the law and the evidence. With reference to what you have heard or read or heard and read, can you lay that aside and decide this case solely on the basis of the law and evidence?

A: (Juror Shafferman): Yeah.

Q: That means that if you're selected as a juror in this case, it is as if you had never heard that. It is as if you never read that, and it has no place at all in your reasoning and thought process. Can you lay it aside?

A: Yes, I can.

It is important to note that at no time during the voir dire of Ms. Shafferman did the appellant place any objections to this juror before the lower court for consideration.

■ As previously set forth by this Court, " ' "The true test to be applied with regard to [the] qualifications of a juror is whether a juror can, without bias or prejudice, return a verdict based on the evidence and the court's instructions and disregard any prior opinions he may have had." Syl. Pt. 1, *State v. Harshbarger*, ... [170 W.Va. 401, 294 S.E.2d 254 (1982) ]' quoting *State v. Charlot*, 157 W.Va. 994, 1000, 206 S.E.2d 908, 912 (1974)." *State v. Finley*, 177 W.Va. 554, 555, 355 S.E.2d 47, 49 (1987). Moreover, in the *Finley* case we also held that all that is required by a trial court when it determines that prospective jurors have been exposed to potentially prejudicial

information is that the trial court "shall question or permit the questioning of the prospective jurors individually, out of the presence of the other prospective jurors, to ascertain whether the prospective jurors remain free of bias or prejudice." Syl. Pt. 1, in part, 177 W.Va. at 555, 355 S.E.2d at 48.

The record in this case clearly reflects that upon Ms. Shafferman's revelation to the court that she might find it difficult to disregard the newspaper and radio accounts of the crime, the trial court, sua sponte, further questioned the juror regarding whether she could remain free of prejudice in deciding the appellant's case. In response to the additional voir dire conducted by the trial court, the juror stated that she could render a decision based solely on the law and evidence of the case.

Consequently, the trial court's actions comported with the guidelines we established in the *Finley* case. *See id.* at 554, 355 S.E.2d at 48. Accordingly, there was no error committed by the trial court in failing to dismiss Ms. Shafferman from the panel.

### B.

■ The appellant also argues that Jurors Webster and Harrison should have been removed from the jury panel for cause. Specifically, William Webster was challenged for cause by the appellant because the appellant's counsel had a claim for a wrongful death action which involved an insurance policy issued by the insurance agency owned by Mr. Webster. The defense counsel told the trial court that he had called into question Mr. Webster's acts involving the underinsured motorists coverage of an automobile policy. Defense counsel further indicated to the trial court that Mr. Webster had provided him with documentation regarding the insurance claim and that he was working with the insurance company in attempts to settle the case.

Based on this information, the trial court once again followed the standards set by this Court in the *Finley* case and allowed the defense counsel to conduct an individual voir dire of the juror to determine if he was prejudiced or biased against the appellant. *See id.* at 555, 355 S.E.2d at 48, Syl. Pt. 1. During this voir dire, Mr. Webster stated that he was not aware of any settlement negotiations and that those would not be under his control. Further, he indicated that he was only remotely involved with the wrongful death claim since he did not issue or accept the initial application for automobile insurance. Most significantly, Mr. Webster told the court that the fact that appellant's counsel was involved in an insurance matter with his agency did not prejudice him against the appellant. He also stated that he could judge the appellant's case impartially.

■ "The decision as to whether to grant a defendant's motion to strike jurors for cause rests within the sound discretion of the trial court." *State v. Bennett,* 181 W.Va. 269, 271, 382 S.E.2d 322, 324 (1989) (citing *State v. Pietranton,* 140 W.Va. 444, [454], 84 S.E.2d 774, 783 (1954)). Based upon a review of the record, we find that the trial court did not abuse its discretion in refusing to dismiss juror Webster for cause.

Lastly, the appellant claims the trial court erred in refusing to dismiss Juror Judith Harrison for cause. First, Ms. Harrison told the court that she had heard and read about the case, but that she had not formed an opinion about the appellant's guilt or innocence and that she could render a decision based solely on the law and evidence of the case. It was also established during voir dire that Ms. Harrison was a neighbor of the Sheriff of Preston County and that their sons played together. She also stated that she knew Deputy Sheriff Robert Baylor, Dr. John Keefe who was the Preston County Medical Examiner, and the victim's father Robert Barlow, Sr. Specifically, Ms. Harrison stated that Dr. John Keefe had given her son a physical and that she knew Robert Barlow, Sr. socially as "[f]riends." [10]

---

10. The record is clear that the defendant's attorney did not request any additional voir dire

With regard to each of these individuals, the trial court asked Ms. Harrison if her acquaintance with these individuals would prevent her from sitting on the appellant's case impartially. She responded that it would not.

Again, the test is whether a juror can render a verdict without bias or prejudice based on the evidence and the court's instructions. *See Finley*, 355 S.E.2d at 49. If the trial court ascertains through voir dire of a juror that the juror can render a verdict impartially then the trial court does not abuse its discretion when it fails to dismiss a juror for cause. This is exactly what occurred with Ms. Harrison. Thus, the trial court committed no error and the appellant was not prejudiced by having to use a preemptory challenge to remove Jurors Webster and Harrison.

## IV.

The next issue is whether the trial court erred in its refusal to grant the appellant's motion to dismiss the indictment on the ground that the prosecuting attorney impermissibly instructed the grand jury. The appellant contends that the prosecuting attorney usurped the judicial power of the court and exceeded his lawful jurisdiction when he explained the difference between premeditation and deliberation to the grand jury without the benefit of the trial court's supervised instructions. The State, on the other hand, asserts that the trial court did not err in denying the appellant's motion to dismiss because 1) the appellant waived this assignment of error by failing to argue it in his motion to dismiss before the lower court; [11] and 2) the prosecuting attorney's comments were not improper.

 We have previously held in syllabus points 2 and 3 of *State ex rel. Miller v. Smith*, 168 W.Va. 745, 285 S.E.2d 500 (1981) that

> A prosecuting attorney can only appear before the grand jury to present by sworn witnesses evidence of alleged criminal offenses, and to render court supervised instructions, W.Va.Code § 7-4-1 (1976 Replacement Vol.); he is not permitted to influence the grand jury in reaching a decision, nor can he provide unsworn testimonial evidence.

> A prosecuting attorney who attempts to influence a grand jury by means other than the presentation of evidence or the giving of court supervised instructions, exceeds his lawful jurisdiction and usurps the judicial power of the circuit court and of the grand jury....

*Accord* Syl. Pts. 1 and 2, *State v. Pickens*, 183 W.Va. 261, 395 S.E.2d 505 (1990).

 The record indicates that the trial court had previously instructed the grand jury on the elements of murder and that the prosecuting attorney was only repeating the court's instruction. It is evident from a review of the grand jury proceeding that all the prosecuting attorney did was simply define the term premeditated. He in no way attempted to influence the grand jury by defining the term nor in any other manner, nor did he attempt to usurp the trial court's or grand jury's power. Therefore, we conclude that the trial court committed no error in its refusal to dismiss the indictment.

## V.

The final issue before this Court is whether the first degree murder conviction was supported by the weight of the evidence presented at trial. The appellant maintains that due to the trial court's error in not charging the jury on self-defense

concerning Ms. Harrison's relationship with Robert Barlow, Sr. Since the defendant did not "avail himself of the opportunity to ask such disqualifying questions ... the party may be deemed not to have exercised reasonable diligence to ascertain the disqualification." Syl. Pt. 8, *Bongalis*, 378 S.E.2d 449; *accord* Syl. Pt. 8, *Arnoldt v. Ashland Oil, Inc.*, 186 W.Va. 394, 412 S.E.2d 795 (1991).

11. This Court finds that although the appellant initially did not raise this issue before the trial court, the record reflects that it was properly brought to the trial court's attention prior to the determination on the motion to dismiss the indictment. Thus, we will address this assignment of error on the merits.

and provocation,[12] the trial court removed from consideration an alternative verdict that would have been much better suited to the factual evidence produced at trial.[13] Moreover, the appellant maintains that the State failed to produce "a scintilla of proof" that the appellant harbored malice towards the victim and that the State offered no evidence of premeditation and deliberation. In contrast, the State asserts that the evidence adduced at trial is sufficient to sustain the appellant's conviction.

■ The standard on appeal to be applied in determining whether sufficient evidence was presented at trial to warrant a conviction is as follows:

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

Syl. Pt. 1, *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978).

■ The evidence in this case revealed that the State established a motive for the murder through the testimony of Penny Kuhn who was the estranged wife of the appellant's brother. Ms. Kuhn testified that the appellant knew she was seeing the victim and six weeks prior to the victim's murder, the appellant told her that if she did not reconcile with the appellant's brother, "something would happen."

The State then offered the appellant's own statement of the events which occurred. Even though, according to the ap-

pellant's statement the victim attacked him first, he is the one who followed the victim first to the victim's truck and then into the woods. Although the appellant was treated for six stab wounds, the State presented the testimony of two physicians that the wounds were superficial, not life threatening, and could have been self-inflicted.

The appellant's statement indicated that after his struggle with the victim, he went looking for and found his brother, Dale Knotts, who left his truck at Thorn Trucking and drove appellant home in the appellant's car. The appellant then stated that Dale Knotts took the appellant's car back to Thorn Trucking and drove the appellant to the hospital in Dale Knotts' truck. The evidence presented by the State, however, revealed that while the appellant's blood samples were found in the victim's truck and on the passenger side of the appellant's car, no blood was found in the appellant's brother's truck. Also introduced at trial was a knife found in a search of the appellant's parents' premises which fit perfectly into the empty knife case on the victim's belt.

Both the circumstantial evidence and the appellant's own statements clearly presented the jury with evidence sufficient to convince them that the defendant was guilty of first degree murder beyond a reasonable doubt.

Based upon the foregoing opinion, we find no error was committed by the trial court and therefore affirm the judgment of the Circuit Court of Preston County.

Affirmed.

---

**12.** It is clear from a review of the instructions given at trial that the jury was instructed on provocation.

**13.** We have already discussed in section I of this opinion the refusal of the trial court to give a

self-defense instruction. *See supra* at pp. 923–924.