# CHARLESTON.

## STATE v. JAMES LAURA.

Submitted February 20, 1923.   Decided February 27, 1923.

1.   HOMICIDE—*Prior Bad Conduct of Deceased Clearly Connected with Time and Place Admissible Under Plea of Self Defense. to Show His State of Mind.*

     In the trial of one accused of homicide, when self defense is relied on, the prior bad conduct of the deceased so closely connected in time and place as to show the state of mind and

characterize the conduct of the deceased towards the ~~defendant or his wife. home or place of business, is admissible in evidence for that purpose. (p. 253).

2.  SAME—*Communicated Threats Against Accused Admissible to Show Mental Attitude of Deceased.*

And the evidence of previous threats of the deceased against the accused and his property communicated to him and calculated to shed light upon the mental attitude of the deceased towards the prisoner, are admissible in evidence for that purpose. (p. 254).

3.  CRIMINAL LAW—*Charge Assuming State of Facts Not Justified by Evidence Erroneous.*

An instruction to the jury on the trial of one accused of murder, which assumes that there has been a quarrel be tween the deceased and the prisoner, and that both were at fault, when there is no evidence justifying such assumption, is erroneous and constitutes reversible error. (p. 254).

4.  SAME—*Where Plea Self Defense Relied on. Error to Assume Malice in Charge Defining Offenses of Which Accused Might be Convicted.*

Where murder is charged, and the prisoner relies on self defense, and the evidence of. malice is wholly wanting, it is error in an instruction to the jury for the court to assume the presnce of malice in the mind of the accused in defining the offenses of which the accused may be found guilty. (p. 254).

5.  SAME—*Refusal to Repeat in Separate Instructions Same Proposition Applicable to Evidence Not Error.*

It is not error for the trial court in an instruction to the jury to refuse to repeat in separate instructions the same proposition of law applicable to the evidence. (p. 256).

6.  HOMICIDE—*Whether Place of Homicide Dwelling of Accused a Question for Court Where Facts Undisputed.*

Where the facts are undisputed, whether the place of the homicide was the dwelling or castle of the prisoner is one of law for the court and not of fact to submit to the jury. (p. 256).

7.  SAME—*Law of Self Defense—Defense of Family or Property Stated.*

In defending himself, his family or his property from the assault of an intruder, one is not limited to his immediate home or castle; his right to stand his ground in defense thereof without retreating extends to his place of business

also and where it is necessary he may take the life of his assailant or intruder. (p. 256).

Error to Circuit Court, Marion County.

James Laura was convicted of voluntary manslaughter, and he brings error.

*Reversed and remanded.*

*Neely & Lively,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for the State.

MILLER, PRESIDENT:

Upon an indictment for the murder of one Hall, the defendant was found not guilty of murder as charged in the indictment, but guilty of voluntary manslaughter, upon which verdict he was sentenced to five years in the state penitentiary.

From this judgment we awarded the defendant this writ of error; and the errors relied on we are now to consider.

The first of these is that the trial court erroneously excluded from the jury the testimony of Draga Grubath. To show its relation to the issues involved, we will state briefly the facts attending the homicide. On the night of and shortly before the killing, the deceased, a large and brutal sort of man, entered the restaurant of the defendant, in the city of Fairmont, connected with a hotel or rooming house kept by him, and in a rough way sat down on a stool at the lunch counter, and with impudent demeanor ordered defendant's wife then in charge to serve him a glass of water and a tooth pick. She served him with the water and pointed to the tooth picks on the counter. Because she did not hand him the tooth picks he made loud complaint, and with vile language and with opprobrious epithets towards her declared his intention to clean up the place, to the annoyance of Mrs. Laura and her customers. She tried to quiet him and directed one of the servants to call the police. He was familiarly known and referred to as "Bull Dog" Hall, which seems to have been fully descriptive of his real char-

acter, as disclosed by his conduct. Hall left the restaurant, following one of the servants, and then followed him back. Defendant then came in, and Hall took up the subject of his complaint with him. Laura then tried to quiet him and inquired of him why he wanted to raise a disturbance, and why he presumed to call his wife those names. He replied to Laura: "Jim, you go to hell, you dirty lousy Dago. I ain't got a bit of use for any of you dagoes; now what are you going to do about it. Come out and fight me." Laura replied: "What's the use of raising a disturbance? Go on; don't bother me; it is no use doing that." Hall replied: "You come out of that counter; I will fight you." He then took hold of a stool next to where he sat, from which the top came off. He then began a tirade of abusive language, too vile and loathsome to repeat in any place, much less in a judicial opinion. The foregoing is the testimony of Mrs. Laura, in which she is substantially corroborated by defendant and other witnesses. After much protestation by defendant, deceased still brandishing the stool said to him: "I am just going to kill you." And then at the request of Mrs. Laura defendant went up stairs, passing between two rows of tables and on through a door with a glass panel in it, taking with him for his protection a pistol. The deceased followed him up the stairway through the door by which defendant had entered; and after defendant had reached the top of the stairs on his way to his room in the hotel, he heard the glass fall which deceased had knocked out of the door, and fearing some harm to his wife turned to look down the stairs; and when deceased reached the top of the stairs defendant fired the shot, which took effect in deceased's abdomen, and from which he died.

The witness Grubath, whose evidence was rejected, kept a soft drink establishment on the same side of the street but some forty feet from the place of business of defendant. The substance of his evidence which was rejected was that on the same evening and shortly before the homicide deceased came into his place of business and was there guilty of the same character of boisterous conduct displayed in defendant's place, and used profanity and abusive language of the

same character later employed towards defendant and his wife, driving out his customers. Of course this prior conduct of deceased could have had no direct bearing on the immediate conduct of defendant when he fired the shot that killed Hall, for it is not shown that he had any knowledge of it. But the evidence did tend to show the state of Hall's mind at the time and to characterize his conduct towards defendant and his wife in their place of business. Evidence of this kind is admissible for that purpose, as we have on other occasions decided; and we think Grubath's testimony should have been admitted in this case for that purpose. *State* v. *Waldron,* 71 W. Va. 1; approved or distinguished in *State* v. *Alderson,* 74 W. Va. 732; *Gibbard* v. *Evans,* 87 W. Va. 650; *State* v. *Arrington,* 88 W. Va. 152.

During the trial defendant was not allowed to prove by his wife that some two or three week's before the homicide deceased came into defendant's restaurant and quarreled with the attendants and waiters and threatened that he would on some future day come back and clean out the place, and that shortly before the night of the tragedy he had boasted that he intended to clean out the place, and that these threats were communicated to the witness and defendant prior to the night of the shooting. It seems to be within the rules of criminal procedure to admit evidence of uncommunicated threats which are calculated to shed light upon the mental attitude of the deceased towards the prisoner. These threats were so communicated, if the evidence is to be believed, and for this purpose they were admissible. *State* v. *Evans,* 33 W. Va. 417; *State* v. *Arrington, supra; Wiggins* v. *People,* 93 U. S. 465. The rejection of this evidence is made the subject of defendant's second assignment of error relied on for reversal.

The remaining error urged relates particularly to the giving and refusing of instructions. It is urged as a third proposition that the court erred in assuming in State's instruction number four that there had been a quarrel between deceased and defendant, and that both were at fault, wherefore the duty rested on defendant, first, before inflicting the mortal blow to decline the combat and retreat as

far as he could, and second, that he necessarily killed the deceased in order to preserve his own life or save himself from great bodily harm.     This instruction then proceeds to define the law of self defense without reference to the fact that the place of the tragedy was defendant's home or place of business.   For this reason we think this instruction was erroneous, not in defining the law of self defense, but in assuming that there had been a quarrel between the parties in which both were at fault.    There is no evidence that defendant had engaged in a quarrel with deceased.   True, he undertook to protect his wife and his place of business from the intrusion of the brutal and vulgar creature who intruded himself therein, and, if declining the combat and retreating were necessary in such a situation, the evidence was that he had done both, and when he fired the shot that killed the intruder, he was on his way to his room followed by his assailant.   The rights of the defendant were then very different from what they would have been if he had been in the open and had there encountered deceased. . *State* v. *Donahue,* 79 W. Va. 260; 7 Enc. Dig. Va. & W. V. Rep. 730, and cases cited.

Another of the State's instructions complained of is number six, on the subject of malice, and advising the jury that there was no particular period within which malice should have existed in the mind of the prisoner, to constitute murder.   This instruction is no doubt good where the law stated is applicable; but there is no evidence in this case justifying the assumption that malice existed at any time before the homicide.   Unless the evidence justified it, such an instruction constituted reversible error, as we held in *State* v. *Hurst,* decided at this term, and cases cited.

Another instruction complained of is one which the court gave on its own motion, telling the jury that they could find the defendant guilty of murder in the first or second degree or of any one of the lesser offenses specified.   Such an instruction in this case was unjustified by the evidence. The jury could not have properly found defendant guilty of murder in the first or second degree, for there was abso-

lutely no evidence of malice or other evidence justifying it. *State* v. *Hurst, supra.*

Defendant's instruction number ten, on the law of self defense, which the court refused to give, was an inaccurate statement of the law; besides the subject was fully covered by another instruction given at the instance of defendant, and its rejection was not error.

Defendant's Instructions Nos. 11, 12 and 13, rejected by the court, relating to the right of one to defend himself, his family and his home or castle, if good, were fully covered by defendant's instruction number nine, except that the court of its own motion erred by adding the words: "But whether or not the building in which the homicide occurred was the defendant's dwelling house or habitation is for the jury to determine." We do not think where the facts, as in this case are, undisputed, the question whether the building in which the homicide occurred was defendant's dwelling house or habitation was one of fact for the jury to determine. It was one of law for the court.

Besides, defendant's rights in cases of this kind are not limited strictly to his dwelling house. His right to defend his person and his property extends to his place of business also; and he is equally entitled to stand his ground and to defend his person and property against the invasion and assault of an intruder, even to the taking of human life, if that becomes necessary. In this case the only home which defendant had was located in the hotel or rooming house, and in the building in which he did business; and he had the right to protect himself against the unlawful incursion and assaults of "Bull Dog" Hall or of any other intruder. In *State* v. *Crawford,* 66 W. Va. 114, the majority opinion was that the rule respecting one's castle did not apply when both parties to the homicide jointly occupied the house where the killing occurred; but such was not the fact in this case. In *State* v. *Manns,* 48 W. Va. 480, an instruction to the jury approved, was that a person has the right to repel force by force in the defense of his person, his family or his habitation, and if in so doing he uses only so much

force as the necessity, or apparent necessity, of the case requires, he is not guilty of any offense, though he kill his adversary in so doing. Of course one would not be justified in taking the life of an intruder unless it was necessary to prevent the commission of a felony on his person or property or on some one under his protection in his house. That this right of self-defense pertaining to one's castle extends also to his place of business has been decided in a number of cases, referred to in a note to *Morrison* v. *Commonwealth* (Ky.), 67 L. R. A. 539, 545.

It follows from what has been said that the court erred in refusing to set aside the verdict and award the defendant a new trial. The judgment will be reversed, the verdict set aside and the defendant awarded a new trial.

*Reversed and remanded.*