STATE OF WEST VIRGINIA

*v.*

ALBERT JAMES ZANNINO

(No. 9888)

Submitted January 28, 1947. Decided March 4, 1947.

*Wyatt & Randolph,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, *Ralph M. Hiner,* Assistant Attorney General, and *Eston B. Stephenson,* Assistant Attorney General, for defendant in error.

KENNA, JUDGE:

Albert James Zannino, then aged twenty-two, was indicted in the Criminal Court of Harrison County for the murder of his father, J. F. Zannino, on the evening of August 15, 1945, by shooting him in the left chest with a double barrel shotgun at close range. To a sentence of from one to five years for voluntary manslaughter, after the Circuit Court of Harrison County had refused a writ of error, this writ of error was granted.

The specific assignments of error are based upon the giving of State's instructions one to six inclusive, and State's instruction number eleven and the re-reading to the jury, at its request, of State's instruction number eleven after the jury had retired to consider of its verdict. With the exception of the assignment based upon the refusal of the trial judge to set aside the verdict of the jury and grant the accused a new trial, the remaining assignments of error are phrased in general language that this Court cannot reduce to the required certainty.

The Zannino family lived in a section of Clarksburg known as Kelly's Hill, which seems to have been, in large measure, an Italian neighborhood. The home, store, and butchershop of J. F. Zannino, the victim, apparently were in the same building at 117 Kelly Street, the dwelling occupying part of the ground floor and all of the second story. The testimony is not clear in its description of the building, but apparently the entrance to the dwelling was from a front porch and into one end of a narrow hallway extending back the depth of the building and having a door to the left as you entered leading into an undescribed room and another door, also at the left, at the rear of the hall leading into a combined sitting and dining room connected with the kitchen that had a doorway onto the back porch. The stairway to the second story seems to have faced the front of the hall with its foot about midway back. No passageway into the store from the dwelling is described although there

is testimony concerning occurrences that took place in the store by witnesses apparently then located in the dwelling. However, since there is no question of relative locations raised in this record, we believe the lack of clarity in that regard deserves only comment.

The shooting and occurrences immediately leading up to it are admitted by the accused in a voluntary written statement made the next day and introduced in evidence by a member of the Clarksburg police department, the contention of the plaintiff in error being that the shooting was done in self defense. The statement of the accused, the testimony of the then coroner, of the officers who were summoned to the Zannino home the night of the shooting, together with that of a photographer who introduced three pictures of the victim's body, comprise the State's case. No testimony was offered in rebuttal.

In the written statement of the accused, which is the State's only evidence of the actual occurrence, after describing previous occurrences when his father had slashed at him with a pocket knife, cutting his clothing; had struck him with a piece of two by four, causing him to lose several teeth; and had thrown a hatchet at him, the accused states that he was awakened on August 15, V. J. Day, at about five o'clock in the morning by whistles, and that on dressing and coming downstairs he saw his father, who told him that he was going out to buy chickens and would drop him at the slaughterhouse. The statement does not say so, but it otherwise appears that the father did drive the accused to the Stout slaughterhouse on Brushy Fork, a few miles outside the city, where Albert stayed helping to kill and prepare meat until just before ten o'clock that night. He didn't see his father again until about five-thirty that afternoon, when he came to the slaughterhouse. He says that his father obviously had been drinking and that he then stated that he was going to "finish everybody" and intended to throw Albert's sister out of the window when he got home that night because she had not opened the store that day. Albert says that his father had two jugs

of wine in his car and that he drove about two miles to a neighbor's house and there spent two hours, returning to the slaughterhouse, asking him, Albert, if he were then ready to go home. Albert told him that he was not because they had not finished killing cattle and salting the hides. Albert states that it was his purpose to spend the night with his friend Virgil Woofter. However, his father said that he would help salt the hides and that then they would go home, asking Albert if he wanted a drink, which Albert declined.

They left the slaughterhouse about five minutes to ten o'clock, taking one of their fellow workmen to his home and then going to their own. Albert states that he knew nothing about a disagreement that had occurred between his father and the rest of the family that day and that when they reached the house the others were sitting around the dining room table and said nothing when they entered. His father then went to the store after bread and, returning, poured for himself a glass of wine from the jug and cut a piece of ham, asking Albert if he wanted a sandwich. Albert declined. His mother then asked Albert if he wanted a cup of coffee and he told her no. His father then turned to his sister Stella and asked her if she had closed the garden gate. Receiving an affirmative reply, he went into the garden for the purpose of investigating. Coming back he repeated his inquiry and being told again that she had closed the gate, he slapped her so hard that she fell against the wall. Seeing that his father was preparing to strike Stella again, Albert stepped between them and told his sister to go to bed. He then went to the kitchen where his mother was washing her hands. His father must have followed because Albert says that he "heard him bang on mother" and that upon his interfering his father told him to get out of the house "right now". His father then said "get out or I will kill you" and started out the hall door stating "I am going to finish all of you." Albert then started to go upstairs to get his clothes and leave. His mother asked him not to do so, stating that his father had whipped them all that day. Albert then looked into

the store where his father had gone and saw him there sharpening a knife and loading a high power rifle with five cartridges. Albert then went into the house and went upstairs where he told his mother what he had seen his father doing and they agreed that they had better leave the house. Albert was to go downstairs before his mother and his sister and they were to follow because Albert had looked down the stairs and had seen that the lights were out in the store. Not knowing where his father had gone he says that he tiptoed downstairs and after he had gotten to the ground floor his father turned on the light in the downstairs hall.

The statement does not locate the deceased when he turned on the light, but apparently the switch was near the front door at that end of the hallway. The accused had gotten "about half way in the hall" or near the door from the hall in to the dining room. He saw his father with one hand holding something concealed under his coat, advancing and at the same time exclaiming: "You're going to get yours first." Albert said that he noticed his father looking at the corner behind him so that he turned and saw there the double barrel shotgun. He says that he had taken this gun upstairs and had brought it down when he came to find and hide some shotgun shells and had then left it in the corner of the hall. At any rate, according to the statement, after picking up the shotgun Albert turned to his father and cautioned him to come no farther, telling him to drop what he had in his hand or he would shoot. To this the deceased paid no attention but kept coming closer, when the accused finally fired.

Albert's testimony differs from his signed statement in a number of ways that might affect his credibility in the judgment of a jury but which we think it is unnecessary to detail here. Both are corroborated in the main by the testimony of his mother and sisters to the extent that their knowledge of the circumstances made possible. The other testimony of the defense was for the purpose of establishing that Joe Zannino in his family affairs

was prone to be tyrannical and violent, that he customarily drank wine to the point of intoxication, and that he frequently had "fits". One of a number of neighbors who testified for the defense, Angelina Cann, states that she frequently went to the Zannino home for the purpose of protecting the family from his violence, on one occasion when he was armed with a pistol and on another with a meat cleaver. She states she did not report the situation to the police for fear of the consequences if she did.

The body of the deceased was not moved until the police arrived and when it was lifted a large boning knife from under his coat fell to the floor. There is no denial that the victim was carrying this knife when he was shot.

From the record before us we cannot say that the accused has established his plea of self defense as a matter of law. The indictment was for murder in the first degree. The verdict reduced that charge to voluntary manslaughter, which is an intentional unlawful killing upon sudden heat of passion with great provocation and without malice. *State* v. *Michael*, 74 W. Va. 613, 620, 82 S. E. 611; *State* v. *Weisengoff*, 85 W. Va. 271, 283, 101 S. E. 450; *State* v. *Pusey*, 118 W. Va. 95, Syl. Pt. 1, 188 S. E. 745. We cannot say that the facts established by the State's testimony are insufficient to sustain the verdict.

As to State's instructions numbers one, two and three, it is unnecessary to consider their correctness because their giving under our cases did not prejudice the accused since each relates to murder in the first degree and the verdict was for the lesser offense of voluntary manslaughter. *State* v. *Bowles*, 117 W. Va. 217, Syl. Pt. 3, 185 S. E. 205; *State* v. *Gunter*, 123 W. Va. 569, Syl. Pt. 2, 17 S. E. 2d 46; *State* v. *Barker*, 128 W. Va. 744, Syl. Pt. 5, 38 S. E. 2d 346.

State's instruction number four is objected to because it tells the jury that where self defense is relied upon the burden is upon the accused to establish it by a pre-

ponderance of the evidence, the defendant contending that it should be sufficient to balance the State's proof of an unlawful homicide and not necessarily to predominate. That is not the holding of this Court. *State* v. *Hatfield,* 48 W. Va. 561, Syl. Pt. 6, 37 S. E. 626; *State* v. *Panetta,* 85 W. Va. 212; 219, 101 S. E. 360; *State* v. *Hardin,* 91 W. Va. 149, Syl. Pt. 2, 112 S. E. 401; *State* v. *Coontz,* 94 W. Va. 59, 66, 117 S. E. 701.

State's instruction number five tells the jury that if the deceased intended to commit merely a common trespass upon the persons of members of the Zannino family other than the accused, that the accused was not justified in taking life to avoid that result. This instruction was predicated upon the frequent altercations that had previously taken place in the Zannino family and which were not followed by great bodily harm or death. We believe this instruction was warranted by the holding of this Court. *State* v. *Greer,* 22 W. Va. 800, Syl. Pt. 14.

State's instruction number six, in effect, tells the jury that self defense rests upon a reasonable apprehension of imminent death or great bodily harm and that the same rule applies in the protection of members of accused's immediate family. We see no error in this instruction.

State's instruction number eleven reads as follows:

"The Court instructs the jury that the right of self defense does not imply the right of attack and will not avail in any case where the difficulty was induced by the party himself, unless before he shoots, the defendant declined further combat and retreated as far as he could with safety, and unless the killing was necessary in order to preserve his own life, or that of his mother or some member of his immediate family, or to protect himself or some member of his immediate family from great bodily harm."

We have examined this record carefully to ascertain evidence that would justify a finding by the jury that the difficulty in this matter was induced by the accused. We have been unable to locate it. True, the accused may

have acted hastily or in the absence of a sufficiently threatening overt act on the part of the deceased. That situation is covered by other instructions of the State that were given without objection. The duty on the part of a person accused of unlawful homicide to retreat is quite different. That duty arises only in the event he was the original aggressor. A person is not required to risk a retreat from an unjustified threatened attack. *State* v. *Cain,* 20 W. Va. 679, Syl. Pt. 7; *State* v. *McCallister,* 111 W. Va. 440, Syl., 162 S. E. 484. It is contended by the defendant in error that instruction number eleven presents only the State's theory, and that instruction number seven given for the defendant telling the jury, in effect, that the accused is not required to retreat from an imminent danger of death or great bodily harm but may resort to homicide without retreating presents the theory of the defendant. This theory would be upheld if there were conflict in the evidence and at least some evidence to sustain both theories. Here, however, we believe that there is no evidence to sustain the theory that the accused induced the difficulty or was the first aggressor. The shooting may not have been justified, but we see nothing in this record that would call upon Albert Zannino to retreat. The fact that the victim was his father does not alter the applicable law, as does not the fact that instructions eleven of the State and seven of the accused were, at its request, re-read to the jury.

Being of the opinion that the giving of State's instruction number eleven was error, the judgment of the Circuit Court and that of the Criminal Court of Harrison County are reversed, the verdict set aside, a new trial awarded and the case remanded to the Criminal Court of Harrison County for that purpose.

*Reversed.*