515 S.E.2d 127

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Brenda S. COOK, Defendant Below, Appellant.**

No. 25408.

Supreme Court of Appeals of West Virginia.

Submitted March 25, 1999.

Decided May 26, 1999.

William D. Moomau, Prosecuting Attorney for Hardy County, Moorefield, West Virginia, Attorney for Appellee.

Daniel R. James, F. Cody Pancake III, Barr, James & Pancake, Keyser, West Virginia, Attorneys for Appellant.

DAVIS, Justice:

Appellant herein and defendant below, Brenda S. Cook, appeals the January 9, 1998, order of the Circuit Court of Hardy County sentencing her to twenty-five years of imprisonment after a Hardy County jury found her guilty of second degree murder. Although Ms. Cook raises several issues on appeal to this Court, we find that one of the issues she raises, whether the State failed to prove beyond a reasonable doubt that she did not act in defense of another, is dispositive of the entire case. Having reviewed the arguments of the parties, the record presented for our consideration on appeal and the pertinent authorities, we find that Ms. Cook presented sufficient evidence to require the State to prove beyond a reasonable doubt that she did not act in the defense of another when she used deadly force against the victim. The State having failed to carry its burden on this issue, we conclude that the conviction and

sentence for second degree murder must be vacated. We further remand this case for entry of a judgment of acquittal.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Brenda S. Cook is forty years old and is married to Gerald Cook. Since 1979, the Cooks have lived in a trailer home on Dover Hollow Road near Moorefield, West Virginia. In May of 1994, the Cooks purchased a two acre tract of land contiguous to their trailer.[1] The two acre tract of land was bound by a road called Hickory Ridge Road. Hickory Ridge Road was used for ingress and egress by several families living in the area.[2]

The tragic event in this case has its genesis on Hickory Ridge Road. Shortly after the Cooks purchased the two acre tract of land, they were harassed and threatened by a few neighbors living in the area. The problems were due, in part, to the Cooks' placement of a fence and rocks along the edge of their property on Hickory Ridge Road even though there was no evidence at trial indicating that the fence and rocks prevented the normal ingress and egress of residents in the area.

One of the individuals who harassed and threatened the Cooks was the victim, Homer Buckler.[3] Mr. Buckler was a huge man, standing 6'4" and weighing in excess of 300 pounds.[4] Evidence at trial revealed that the Cooks' fence along Hickory Ridge Road was torn down, roofing nails were placed in their

driveway, and piles of dirt and rocks were tossed onto their property.[5] In 1995, an unknown person forged Mr. Cook's signature on a letter threatening the President of the United States. The United States Secret Service investigated the matter and exonerated Mr. Cook after concluding that he did not write the letter and that his signature on the letter had been forged. The Cooks identified Mr. Buckler as a possible suspect, but the investigation was terminated.

During the night of December 23, 1996, a loud explosion shook the home of the Cooks. An investigation of the explosion was made by the United States Secret Service. It was determined that Mr. Buckler and several of his friends had exploded a homemade bomb constructed with black gunpowder.[6] No one was injured as a result of the explosion. That investigation concluded without charges being filed.

Evidence was also introduced which showed that the Cooks sought legal help to prevent harassment and intimidation by Mr. Buckler and others.[7] Law enforcement agencies were contacted and letters were sent to state government officials asking for help to stop Mr. Buckler and others from intimidating the Cook family.[8] In particular, after the Cooks' fence was torn down, the Cooks contacted the Hardy County Sheriff. An investigation followed resulting in Mr. Buckler agreeing to apologize to the Cooks. However, instead of apologizing, Mr. Buckler visited the Cooks and threatened to kill them

---

1. The Cooks had planned to build a home on the property.

2. The two acre tract of land purchased by the Cooks extended to the center of Hickory Ridge Road.

3. Mr. Buckler lived with his wife and children on the property above the two acre tract purchased by the Cooks.

4. Mr. Buckler's size is a crucial factor in this case. The eventual altercation that led to his death involved Mr. Cook, who was 5'6" and weighed about 140 pounds.

5. Mr. Buckler used a bulldozer to push piles of dirt and debris onto the Cooks' property.

6. Mr. Buckler was a member of a local hunting group called "Bear's Heil." Some of the other persons harassing the Cooks were also members of this group.

7. The Cooks retained legal counsel to advise them on the placement of a fence along their property line.

8. A cabin in the area that was owned by the Cooks was also vandalized. Additionally, Mr. Cook's ninety-two year old father, who lived in the area, was harassed by Mr. Buckler and others.

if they ever again called the authorities regarding his conduct.[9]

On May 7, 1997, Mrs. Cook telephoned Trooper Tom Wood to ascertain the status of an investigation into the vandalism of the Cooks' nearby cabin. Trooper Wood indicated that he was going to come out to the area to speak with Mr. Buckler about the matter. Shortly after the telephone conversation with Trooper Wood, Mrs. Cook heard a truck engine racing outside her home. She looked outside and saw Mr. Buckler throwing rocks onto her property in the direction of her husband, Mr. Cook.

Mr. Cook testified that he approached Mr. Buckler and asked him not to throw the rocks onto his property. During this time, Mrs. Cook loaded a shotgun and walked outside. Mrs. Cook fired a warning shot into the air in an effort to get Mr. Buckler to leave the area. After firing the shot, she proceeded to walk hurriedly to her husband's side. Upon approaching her husband and Mr. Buckler, Mrs. Cook pleaded with Mr. Buckler to leave them alone. Mr. Buckler would not listen. Mrs. Cook then loaded another shell into the shotgun. Mr. Buckler turned to Mrs. Cook and stated, "What are you going to do, shoot me?" Mrs. Cook testified that she responded, "No sir, Homer, I didn't come up here to hurt anybody, just please leave us alone." Mrs. Cook then informed Mr. Buckler that she had already called the police. Mr. Buckler immediately looked at Mr. Cook and stated, "You're a G—d----- dead man. I warned you, I told you never to call them."

Mr. Cook turned from Mr. Buckler and began walking away. Clayton Brent, a neighbor of the Cooks and an eyewitness to the events, testified as to what he heard and saw regarding Mr. Cook's attempt to walk away: [10]

Q. What did you see happen?

A. Homer was up in—up to Gerald and he threatened him and—

Q. What did he say to him?

A. Exactly?

Q. Yes, sir.

A. "Why don't you try to climb my f------ tree? It's a big one."

Q. Then what happened?

A. Gerald turned and was walking away.

. . . .

Q. What happened then? Where was Brenda when this was going on?

A. Down a little ways. What—

Q. Then what happened?

A. Homer—or Gerald said, "You mother," and he shut up and was still walking and Homer was following Gerald.

Mrs. Cook testified that as Mr. Cook walked away, Mr. Buckler attacked him and spun him around. At which point, Mr. Cook took a swing at Mr. Buckler. The evidence indicated that Mr. Buckler then proceeded to throw Mr. Cook to the ground and began beating him. As Mr. Buckler beat Mr. Cook, who was defenseless and pleading for mercy, Mrs. Cook rushed to help her husband. Mrs. Cook held the shotgun in one hand and attempted to pull Mr. Buckler off of her husband. Mr. Buckler paused long enough to strike Mrs. Cook and rip her shirt open. Two eyewitnesses, Norma Gibson and Rebla Jackson, testified that Mr. Buckler struck Mrs. Cook.[11] Norma Gibson testified as follows:

Q. It looked like she was doing what? What did you see?

A. It looked like she was trying to put her hand and stop him or something. I mean, that's what it looked like to me.

---

9. Evidence was introduced at trial which showed that Mr. Buckler had previously threatened two other residents in the area. Lester Collins testified that Mr. Buckler pointed a shotgun at him and told him to stop traveling on Hickory Ridge Road. Another witness, Frank Brent, testified that Mr. Buckler pointed a shotgun at him and accused him of destroying Mr. Buckler's mailbox. The record also indicated that Mrs. Cook was fully aware of the violent threats to others made by Mr. Buckler.

10. Mr. Brent was called as a witness by the State. He testified that he was taking a shower when he heard the first shot fired by Mrs. Cook. Mr. Brent initially looked out his window to observe the events. Later, he walked outside to the scene.

11. Norma Gibson is the daughter of Rebla Jackson. They lived near the Cooks. At the time of this incident, they were at home having dinner.

Q. Did you see a gun?

A. No, sir.

Q. You did not see a gun?

A. No, I didn't.

Q. Then what did you see Mr. Buckler do?

A. I seen him take his right hand, he come out, he hit Bren[da], and I said, oh my gosh, ma, he hit her, he hit her.

Rebla Jackson testified as follows:

Q. Do you recall your daughter saying anything about seeing Mr. Buckler?

A. Yes, she said, oh my gosh, mom, he hit Bren, because that's what they called her, Bren. I looked and he had his hand up against her and she went back.

Q. So you looked and when you looked, did you see Mr. Buckler's hand on Brenda Cook?

A. Yes, I did.

Q. What was he doing?

A. He had his hand on her and she went back then.

Q. Did she fall down?

A. No, she didn't fall down.

Mrs. Cook testified that after she was struck by Mr. Buckler she continued pleading with him to stop beating her husband. Mr. Buckler ignored her and continued beat-

ing Mr. Cook.[12] Mrs. Cook testified that she was afraid her husband would be killed, so she aimed the shotgun at Mr. Buckler's right arm and fired. The shot landed under Mr. Buckler's right armpit. Mr. Buckler fell off Mr. Cook. However, Mr. Buckler attempted to get up. Mrs. Cook reloaded the shotgun and prepared to fire again. She did not fire a second shot because Mr. Buckler fell to the ground.

Clayton Brent was the first person to arrive at the scene. He testified as follows:

Q. What was she doing when you got there?

A. When she got—when I got there to her?

Q. When—yes. You're what? Thirty yards away you said. It took just a couple of seconds to get there, right?

A. She was crying.

. . . .

Q. Did she say anything other—the first words out of her mouth quite frankly were, "I thought he was going to kill Gerald." Isn't that right?

A. Yes.

. . . .

Q. When you were running up there to your mother's house, do you remember

---

12. Clayton Brent testified as to what he saw regarding the beating:

Q. You see Gerald go down, don't you.
A. Yes, I seen him drop.
Q. He's on his knees, isn't he?
A. Yes.
Q. Homer's bent over him, isn't he?
A. Yes.
Q. What you can see are Homer's arms?
Q. Yes.
. . . .
Q. . . . Did—when Homer was bent over Gerald, did you see Gerald move at all from that location where he was on the ground?
A. No, I—
Q. Did you see—did you see his fist coming back up, hitting?
A. I couldn't see Gerald. I could only see the back of Homer right there at that point when he was bent over him.
Q. He's a big man?
A. Yes.
Q. He's a big man, isn't he? Right?
A. Yes.
Q. Was he coming down with a lot of force?

A. Yes.
Q. Is Brenda screaming, "Stop, stop, please stop," at that juncture?
A. Yes.
Q. Has she pointed the gun at anyone yet?
A. No.
Q. You froze on your porch, didn't you?
A. Yes.
Q. You were scared?
A. Yes.
. . . .
Q. Now let me ask you this: How many—how long or how many blows does he inflict on Gerald?
A. You know, I really couldn't say. It's—it—
Q. Is it one?
A. —can be a lot, you know.
Q. Is it one?
A. No.
Q. Is it two?
A. He hit him more than that.
Q. A dozen?
A. He did it—alls I could see was his arms wailing.
Q. Coming down with a lot of force?
A. Yes.

Brenda yelling to you, "Call an ambulance?"

A. That was right after—that was right after she shot Homer and I was on my way to her—to them.

Q. She says, "Call an ambulance?"

A. Yes. She yelled, "Call the police or an ambulance."

Q. In this whole episode that you witnessed, how would you describe Homer Buckler's actions? How exactly?

A. I could tell there was going to be a fight.

Q. He was angry, wasn't he?

A. Yes. He didn't want to—he didn't want to leave it alone. That's what it seemed like to me.

Mr. Buckler lived for a short period of time after the gunshot. He was taken to Memorial Hospital and Medical Center in Cumberland, Maryland, where he was pronounced dead. Subsequently, a grand jury rendered a one count indictment charging Mrs. Cook with first degree murder. The trial began on August 11, 1997. On August 14, 1997, a jury returned a verdict finding Mrs. Cook guilty of second degree murder. The trial court sentenced Mrs. Cook to a definite term of twenty-five years imprisonment. This appeal followed.

## II.

### STANDARD OF REVIEW

The controlling issue in this case requires this Court to determine whether the evidence was sufficient to sustain a conviction for second degree murder. Mrs. Cook contends that the state failed to establish beyond a reasonable doubt that she did not act in defense of another, her husband, in causing the death of Mr. Buckler. In Syllabus point 1 of State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court clarified the appellate standard of review where a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction:

> The function of an appellate court when reviewing the sufficiency of the evidence to

support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

We elaborated in Syllabus point 3, in part, of Guthrie, in part, by stating that:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

Id.

With these principles in mind, we will examine the evidence for sufficiency to sustain the conviction.

## III.

### DISCUSSION

#### A. History of the Defense of Another Doctrine

The basic premise underlying the doctrine of defense of another (also called defense of others) is that a person is justified in using force to protect a third party from unlawful force by an aggressor. The defense of another doctrine closely parallels the common law doctrine of self-defense.[13] See Ad-

---

13. In some of our earlier cases this Court actual-

ly used the term "self-defense" when referring to

*kins v. Commonwealth*, 293 Ky. 329, 168 S.W.2d 1008 (1943); *Commonwealth v. Martin*, 369 Mass. 640, 341 N.E.2d 885 (1976). In *State v. Saunders*, 175 W.Va. 16, 19, 330 S.E.2d 674, 677 (1985), we pointed out that "[t]he right to defense of another usually falls under the rubric of self-defense. One simply steps into the shoes of the victim and is able to do only as much as the victim himself would lawfully be permitted to do."[14] The broad parameters of the defense of another doctrine were articulated by this Court over one hundred years ago in the case of *State v. Greer*, 22 W.Va. 800, 819 (1883), wherein we held that the right of defense of another may be exercised in defense of a family member:

> What one may lawfully do in defense of himself—when threatened with death or great bodily harm, he may do in behalf of a brother; but if the brother was in fault in provoking an assault, that brother must retreat as far as he safely can, before his brother would be justified in taking the life of his assailant in his defense of the brother. But if the brother was so drunk as not to be mentally able to know his duty to retreat, or was physically unable to retreat, a brother is not bound to stand by and see him killed or suffer great bodily harm, because he does not under such circumstances retreat. It is only the faultless, who are exempt from the necessity of retreating while acting in self-defense. Those in fault must retreat, if able to do so; if from the fierceness of the attack or for other reasons they are unable to retreat, they will be excused by the law for not doing so.

*Accord Saunders*, 175 W.Va. at 17, 330 S.E.2d at 675; *State v. Wisman*, 93 W.Va. 183, 194, 116 S.E. 698, 702 (1923). In *State v. W.J.B.*, 166 W.Va. 602, 608, 276 S.E.2d 550, 554 (1981), a case involving both the doctrine of self-defense and defense of another, we pointed out that

"a person has the right to repel force by force in the defense of his person, his family or his habitation, and if in so doing he uses only so much force as the necessity, or apparent necessity, of the case requires, he is not guilty of any offense, though he kill his adversary in so doing." (Quoting *State v. Laura*, 93 W.Va. 250, 256–57, 116 S.E. 251, 253 (1923) and citing *State v. Preece*, 116 W.Va. 176, 179 S.E. 524 (1935); *State v. Thornhill*, 111 W.Va. 258, 161 S.E. 431 (1931); *State v. Clark*, 51 W.Va. 457, 41 S.E. 204 (1902); *State v. Manns*, 48 W.Va. 480, 37 S.E. 613 (1900)).

Our cases have succinctly articulated the development and scope of the doctrine of self-defense and the use of deadly force under it. However, we have not had occasion to thoroughly discuss the defense of another doctrine. The facts of the instant case require that we fully explore this doctrine's principles.

**1. Initial limitations on the doctrine of defense of another.** The application of the common law doctrine of defense of another was very limited in its earliest beginnings. The doctrine was imposed only as a defense when a homicide occurred in defense of a member of one's family.[15] Under the common law, "the privilege of using [deadly] force ... did not include authority for intervenors to protect third persons who were strangers to the intervenor." *Alexander v. State*, 52 Md.App. 171, *172*, 447 A.2d 880, 882 (1982). Commentators have suggested that because of the initial limitation of the doctrine to one's family, it did not actually derive from the self-defense doctrine. *See* Marco F. Bendinelli & James T. Edsall, *Defense of Others: Origins, Requirements, Limitations and Ramifications*, 5 Regent U.L.Rev. 153, 155–156 (1995). Blackstone theorized that the defense actually arose out of the right to protect one's property. Blackstone noted that, at common law, one's acquired rights of

defense of another. *See, e.g., State v. Wisman*, 93 W.Va. 183, 116 S.E. 698 (1923).

**14.** This Court noted in *State v. W.J.B.*, 166 W.Va. 602, 613, 276 S.E.2d 550, 557 (1981), that "[w]e have recognized the accepted rule that the defendant may interpose the defense of self-defense in protecting a member of his family as well as in

protecting himself" (citing *State v. Wilson*, 145 W.Va. 261, 114 S.E.2d 465 (1960); *State v. Zannino*, 129 W.Va. 775, 41 S.E.2d 641 (1947)).

**15.** Two jurisdictions limit the doctrine, by statute, to family members. *See* Cal.Penal Code § 1963 (West Main Vol.1999); Idaho Code § 18–4009 (1972) (Main Vol.1997).

property encompassed his wife, child, parent, or servant. 3 William Blackstone, Commentaries on the Law of England, ch.1, § 8(2) (1916).

The initial limitation of the doctrine to one's family eroded with time as courts began to extend the doctrine to allow for the defense of strangers. *See State v. Chiarello*, 69 N.J.Super. 479, 174 A.2d 506 (App.Div. 1961). The expansion of the doctrine to include strangers brought` with it a theory of potential liability. This theory was called the "alter ego" rule. The alter ego rule held that a defendant using deadly force to defend a person who was not entitled to use deadly force would be held criminally liable. *See Moore v. State*, 25 Okla.Crim. 118, 218 P. 1102 (1923); *Leeper v. State*, 589 P.2d 379 (Wyo.1979). In *State v. Best*, 91 W.Va. 559, 575, 113 S.E. 919, 925 (1922), this Court alluded to the alter ego rule when it was said that "the right of a person to defend another does not ordinarily exceed such person's right to defend himself[.]"

**2. Development of reasonable belief standard.** The alter ego rule worked a considerable hardship upon defendants who unknowingly intervened to aid third parties who were not privileged to use self-defense. In such situations, the intervenor was criminally liable for any injury or death he or she caused. *See People v. Young*, 11 N.Y.2d 274, 229 N.Y.S.2d 1, 183 N.E.2d 319 (1962); *State v. Wenger*, 58 Ohio St.2d 336, 390 N.E.2d 801 (1979). Many jurisdictions began to reject the alter ego rule, to a large extent, because of the position taken by the American Law Institute's Model Penal Code, § 3.05 (1985).[16] The Model Penal Code adopted the "reasonable belief" rule, which provided that an intervenor who acts in defense of another is not liable if his or her actions were reasonable under the circumstances. Under this rule, a defendant may be legally justified in killing to defend another, even if the intervenor acted under a mistaken belief as to who was at fault, provided his or her belief was reasonable.[17]

16. The pertinent provision in Section 3.05 of the Model Penal Code provides as follows:

(1) Subject to the provisions of this Section and of Section 3.09, the use of force upon or toward the person of another is justifiable to protect a third person when:

(a) the actor would be justified under Section 3.04 in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect; and

(b) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and

(c) the actor believes that his intervention is necessary for the protection of such other person.

17. The defense of another doctrine has been codified consistent with the Model Penal Code in the following states: Ala.Code § 13A–3–23 (1979) (Repl.Vol.1994); Alaska Stat. § 11.81.340(198) (Michie Main Vol.1998); Ariz. Rev.Stat. Ann. § 13–406 (1978) (West Main Vol. 1989); Ark.Code. Ann. § 5–2–607 (1997) (Michie Rep. Vol.1997); Cal.Penal Code § 197 (1963) (West Main Vol.1999) (limit to family); Colo.Rev. Stat. § 18–1–704 (1963) (Main Vol.1998); Conn. Gen.Stat. Ann. § 53a–19 (1992) (West Main Vol. 1994); Del.Code Ann. tit. 11, ´ § 465 (1953)(Repl.Vol.1995); Fla. Stat. Ann. § 776.012 (1997) (West Supp.1999); Ga.Code Ann. § 16–3– 21 (1993) (1996 ed.); Haw.Rev.Stat. § 703–305 (1993) (Repl.Vol.1993); Idaho Code § 18–4009 (1972) (Main Vol.1997) (limited to family); Ill. Comp. Stat. Ann. 5/7–1 (1962) (West Main Vol.

1993); Ind.Code. Ann. § 35–41–3–2 (1972) (Michie Repl.Vol.1998); Iowa Code Ann. § 704.3 (1978) (West Main Vol.1993); Kan. Stat. Ann. § 21–3211 (1970) (Main Vol.1995); Ky.Rev.Stat. Ann. § 503.070 (1974) (Michie Repl.Vol.1990); La.Rev.Stat. Ann. § 14:22 (1942) (West Supp. 1997); Me.Rev.Stat. Ann. tit. 17–A, § 108 (1979) (West Main Supp. Vol.1983) and (1997) (West Supp.1998); Minn.Stat. Ann. § 609.065 (1986) (West Main Vol.1987); Miss.Code Ann. § 97–3–15 (1983) (Main Vol.1994); Mo. Ann. Stat. § 563.031 (1993) (West Supp.1999); Mont. Code Ann. § 45–3–102 (1973) (Main Vol.1997); Neb.Rev.Stat. § 28–1410 (1975) (Repl.Vol.1995); Nev.Rev.Stat. § 200.160 (1993) (Main Vol.1997); N.H.Rev.Stat. Ann. § 627:4 (1981) (Repl.Vol. 1996); N.J. Stat. Ann. § 2C:3–5 (1979) (West Main Vol.1995); N.M. Stat. Ann. § 30–2–7 (1963) (Michie Repl. Pamphlet 1994); N.Y. Penal Law § 35:15 (1980) (McKinney Main Vol.1998); N.D. Cent.Code § 12.1–05–04 (1973) (Repl.Vol. 1997); Okla. Stat. Ann. tit. 22, § 33 (1910) (West Main Vol.1992); Or.Rev.Stat. § 161.209 (1979) (Main Vol.1997); Pa. Stat. Ann. tit. 18, § 506 (1972) (West Main Vol.1998); S .D. Codified Laws Ann. § 22–18–4 (1939) (Michie Rev.1998); Tenn.Code Ann. § 39–11–612 (1989) (Repl.Vol. 1997); Tex. Penal Code Ann. § 9.33 (1994) (West Main Vol.1994); Utah Code Ann. § 76–2–402 (1994) (Repl.Vol.1995); Vt. Stat. Ann. tit. 13, § 2305 (1983) (Main Vol.1998); Wash. Rev.Code Ann. § 9A.16.050 (1975) (West Main Vol.1988); Wis. Stat. Ann. § 939.48 (1993) (West Main Vol. 1996).

Jurisdictions that have not codified the doctrine of defense of another include: District of

## B. Basic Requirements for the Defense of Another Doctrine

In this Court's review of its past decisions, decisions of other jurisdictions and commentaries, the doctrine of defense of another may be succinctly articulated. We therefore hold that to establish the doctrine of defense of another in a homicide prosecution, a defendant must show by sufficient evidence that he or she used reasonable force, including deadly force, in a situation where the defendant had a reasonable belief of the lawfulness of his or her intervention on behalf of another person who was in imminent danger of death or serious bodily harm from which such person could save himself/herself only by using force, including deadly force, against his or her assailant, but was unable to do so. We will now proceed to examine the key elements of the doctrine of defense of another.

**1. Burden of proof.** The doctrine of defense of another is an affirmative defense. This Court, as well as the United States Supreme Court, has made clear that "a defendant can be required to prove the affirmative defenses that he asserts." *State v. Daniel*, 182 W.Va. 643, 652, 391 S.E.2d 90, 99 (1990) (citing *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).[18] As a general rule, we held in Syllabus point 5 of *Daniel* that "[a] defendant is required to present evidence on the affirmative defenses asserted as long as the State does not shift to the defendant the burden of disproving any element of the States case." *Id.* Though we have not previously articulated the standard for the defense of another, lower courts and this Court have assumed that the standard used for self-defense was applicable to defense of another cases.

In this Court's decision in *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978), we abandoned the preponderance of the evidence standard that was previously imposed by this Court upon defendants asserting self-defense. *See also State v. Schrader*, 172 W.Va. 1, 3, 302 S.E.2d 70, 72 (1982) ("There is no question that this is no longer the law in West Virginia."). In lowering the defendant's burden on self-defense in *Kirtley*, we held that "[o]nce there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense." Syl. pt. 4, *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374. Under *Kirtley*, a defendant "merely must produce sufficient evidence to create a reasonable doubt on the issue." *State v. Clark*, 171 W.Va. 74, 76, 297 S.E.2d 849, 851 (1982).[19] The standard in *Kirtley* is appropriate for adoption as the standard for the doctrine of defense of another. Consequently, we hold that the burden of proof placed upon a defendant asserting the doctrine of defense of another is not a high standard. To properly assert the defense of another doctrine, a defendant must introduce "sufficient" evidence of the defense in order to shift the burden to the State to prove beyond a reasonable doubt that the defendant did not act in defense of another.

**2. Amount of Force.** A defendant asserting the defense of another must show that the force used was reasonable. This requirement is also known as the "proportionality" rule. Shelby A.D. Moore, *Doing Another's Bidding Under a Theory of Defense of Others: Shall We Protect the Unborn with Murder*, 86 Ken.L.J. 257, 285–86 (1998).

In defending another, a defendant is not legally obliged to arbitrarily use any degree of force he or she chooses. *People v. Jordan*, 130 Ill.App.3d 810, 86 Ill.Dec. 86, 474 N.E.2d 1283 (1985) (excessive force used). That is "a person may use only that force

Columbia, Maryland, Massachusetts, Michigan, North Carolina, Ohio, Rhode Island, South Carolina, Virginia, West Virginia and Wyoming.

**18.** "[T]he common-law rule was that affirmative defenses, including self-defense, were matters for the defendant to prove." *Martin v. Ohio*, 480

U.S. 228, 235, 107 S.Ct. 1098, 1103, 94 L.Ed.2d 267, 275 (1987).

**19.** *But see Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (upholding a requirement that defendant prove self-defense by a preponderance of the evidence).

which is necessary in view of the nature of the attack; any use of excessive force is not justified and a homicide which results therefrom is unlawful." *People v. Clark*, 130 Cal. App.3d 371, 181 Cal.Rptr. 682, 686 (1982)(citing *People v. Young*, 214 Cal.App.2d 641, 29 Cal.Rptr. 595 (1963)). This principle of law is taken from the doctrine of self-defense. Our Court has previously held that

> the amount of force that can be used in self-defense is that normally one can return deadly force only if he reasonably believes that the assailant is about to inflict death or serious bodily harm; otherwise, where he is threatened only with non-deadly force, he may use only non-deadly force in return.

*State v. W.J.B.*, 166 W. Va. 602, 608, 276 S.E.2d 550, 557(1981) (citing *Rose v. Commonwealth*, 422 S.W.2d 130 (Ky.1967); *Stennis v. State*, 234 So.2d 611 (Miss.1970); *State v. Parker*, 403 S.W.2d 623 (Mo.1966); *State v. Pearson*, 288 N.C. 34, 215 S.E.2d 598 (1975); *State v. Clark*, 51 W.Va. 457, 41 S.E. 204 (1902); W. LaFave & A. Scott, Criminal Law 392–93 (1972)). Therefore, the reasonable force standard is appropriate for the doctrine of defense of another.

 **3. Reasonable belief that intervention was lawful.** The "reasonable belief" standard of intervention emphasizes what the intervenor believes about the cir- · cumstances, as opposed to what are the actual circumstances. An Alabama court has ruled that the reasonable belief standard "shifts the emphasis to [the] defendant's reliance on reasonable appearances rather than exposing him to the peril of liability for defending another where appearances were deceiving and there was no actual imminent danger." *Morris v. State*, 405 So.2d 81, 83 (Ala.Crim.App.1981).[20] Similarly, this Court has previously ruled that "[t]he reasonableness of [a defendant's] belief and actions in using deadly force must be judged in the light of the circumstances in which he acted at the time and is not measured by subsequently developed facts." Syl. pt. 3, *State v.*

*W.J.B.*, 166 W.Va. 602, 276 S.E.2d 550. Moreover, the reasonable belief standard "is founded upon, and strengthened by [the] persuasive policy consideration[ ] ... [that] one should not be convicted of a crime if he selflessly attempts to protect a victim of an apparently unjustified assault[.]" *State v. Holmes*, 208 N.J.Super. 480, *488*, 506 A.2d 366, 370 (App.Div.1986) (internal quotations and citation omitted).

 The reasonableness of an intervenor's belief is determined by both a subjective and an objective inquiry. It was noted in *David v. State*, 698 P.2d 1233, 1235 (Alaska Ct.App.1985), that the "defense is composed of an objective element, i.e., a reasonable belief that force is necessary, and a subjective element, i.e., an actual belief that force is necessary." In other words, the "actor must actually believe that [another] is in danger and that belief must be a reasonable one." *State v. Elam*, 328 N.W.2d 314, 317 (Iowa 1982). *See Smiley v. State*, 395 So.2d 235 (Fla.Dist.Ct.App.1981); *State v. Moore*, 178 N.J.Super. 417, 429 A.2d 397 (1981). Insofar as the reasonable belief standard is used by this Court for self-defense, it is an appropriate standard for the doctrine of defense of another.

 **4. Level of danger.** An intervenor is not obliged to use deadly force in defense of another, unless the third party is in imminent danger of death or serious bodily harm. This "simply means that an intervenor cannot act until the party whom the intervenor is defending is immediately threatened." Moore, *Doing Another's Bidding Under a Theory of Defense of Others*, 86 Ken.L.J. at 284. This criterion is no different from that which this Court uses in the context of self-defense. We have held that a person who reasonably believes he or she "is in imminent danger of death or serious bodily harm ... has the right to employ deadly force in order to defend himself." *State v. W.J.B.*, 166 W.Va. at 606, 276 S.E.2d at 553 (citing *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978); *State v. Green*, 157 W.Va. 1031, 206

---

20. The requirement that the intervenor believe his or her intervention is "lawful" is aimed primarily at the following situation: If a defendant comes upon a police officer, who is dressed in police uniform, and observes the officer overpowering a third person, it ostensibly would be unlawful to intervene to assist the third person.

**602**

S.E.2d 923 (1974); *State v. Bowyer*, 143 W.Va. 302, 101 S.E.2d 243 (1957); *State v. Preece*, 116 W.Va. 176, 179 S.E. 524 (1935)). *Accord State v. Hughes*, 197 W.Va. 518, 524, 476 S.E.2d 189, 195 (1996). The imminent danger standard is appropriate for the doctrine of defense of another, as it is consistent with the requirement for using deadly force in self-defense.

### C. Application of Law to Facts

 Mrs. Cook asserted the defense of another doctrine at trial. The trial court gave an adequate instruction of the law regarding the defense to the jury. In Syllabus point 3 of *State v. Saunders* we held that "[t]he validity of a claim of defense of another, like the question of self-defense, is properly a matter for the jury's determination." 175 W.Va. 16, 330 S.E.2d 674. Mindful of the jury's province over the evidence presented on the issue of defense of another, this Court will not permit an injustice to occur because a jury failed to adequately understand the evidence presented at trial. This is such a case.

**1. Mr. Cook was privileged to use deadly force in self-defense.** The facts of the case viewed in the light most favorable to the prosecution, clearly illustrate that Mr. Buckler stopped his truck in front of the Cooks' residence and began throwing rocks onto their property. The rocks had been placed by the Cooks near their property line fence. There was no evidence to indicate that the rocks were unlawfully situated alongside their property. Mr. Cook approached Mr. Buckler and asked him to stop removing the rocks and throwing them further onto his property. Mrs. Cook observed the two men, while in her home, and became afraid for her husband's safety. The testimony was that Mrs. Cook grabbed a shotgun and fired into the air hoping Mr. Buckler would get back into his truck and leave them alone.

Mr. Buckler was not deterred by the gunshot. In contrast, he continued to yell and curse at Mr. Cook. Mrs. Cook moved quickly to her husband's aid. The record supports that both Mr. and Mrs. Cook tried to reason with Mr. Buckler, but to no avail. When Mrs. Cook informed Mr. Buckler that she had called the police, he became incensed and renewed a previous threat to kill them if they had again called the police. At this point, Mr. Cook retreated.[21] He began to walk away from Mr. Buckler. This Court long ago held that "[t]o reduce homicide in self-defense to excusable homicide, it must be shown that the [defendant] was closely pressed by the other party, and retreated as far as he conveniently or safely could, in good faith, with the honest intent to avoid the violence of the assault." Syl. pt. 2, *State v. Zeigler*, 40 W.Va. 593, 21 S.E. 763 (1895).

Mr. Buckler followed Mr. Cook, grabbed Mr. Cook and spun him around. At this juncture, the evidence demonstrates that Mr. Buckler's conduct of grabbing and spinning Mr. Cook was hostile and constituted a battery.[22] Exercising his right to self-defense, Mr. Cook took a swing at the aggressor, Mr. Buckler. While the evidence was disputed as to whether Mr. Cook actually hit Mr. Buckler, this fact is of no consequence because the law permitted Mr. Cook to use such reasonable force the moment Mr. Buckler violently grabbed and spun him. A person "may only use non-deadly force where he is threatened only with non-deadly force." *State v. Knotts*, 187 W.Va. 795, 801, 421 S.E.2d 917, 923 (1992) (citing *State v. Baker*, 177 W.Va. 769, 356 S.E.2d 862 (1987)).

One swing in self-defense was attempted by Mr. Cook. Mr. Buckler immediately threw his 6'4" frame upon Mr. Cook's 5'6" frame, knocking him to the ground. Mr. Buckler began to beat Mr. Cook with unrestrained blows throughout his body. Two critical observations are required at this point. First, based upon the testimony of the witnesses, Mr. Cook was unable to free himself from the

**21.** "In cases of assault, not made with the intent to kill or do great bodily harm, or when the person assaulted is not in his dwelling-house, he cannot justifiably kill his assailant without first having retreated 'to the wall.'" Syl. pt. 4, *State v. Clark*, 51 W.Va. 457, 41 S.E. 204 (1902).

**22.** The offense of battery is defined by W.Va. Code § 61–2–9(c) (1978) (Repl.Vol.1997), in part, as "unlawfully and intentionally mak[ing] physical contact of an insulting or provoking nature with the person of another[.]"

relentless blows to his body by Mr. Buckler. Second, because of the great size and strength difference between the two men, Mr. Cook was legally at liberty to use force, including deadly force, to defend himself from the vicious and relentless blows by Mr. Buckler as Mr. Cook faced real and imminent danger of great bodily harm or death from the massive blows being inflicted upon him by Mr. Buckler.

**2. Mrs. Cook was privileged to use deadly force in defense of her husband.** The evidence is clear. When Mr. Buckler began beating Mr. Cook, it was not possible for Mr. Cook to resort to the use of deadly force, or any type of force, to defend himself, because of the enormous size of Mr. Buckler. Mr. Cook was defenseless. Although we have clarified the doctrine of defense of another in this opinion, the law in this State has long been that

> a person has the right to repel force by force in the defense of his ... family ... and if in so doing he uses only so much force as the necessity, or apparent necessity, of the case requires, he is not guilty of any offense, though he kill his adversary in so doing.

*State v. Laura,* 93 W.Va. 250, 256–57, 116 S.E. 251, 253 (1923). Therefore, when Mrs. Cook saw that her husband was defenseless, as he laid curled on the ground absorbing every violent blow Mr. Buckler hurled at his body, the law permitted her to intervene.

Mrs. Cook testified that she became afraid and believed that her husband would be killed by Mr. Buckler. This Court has previously ruled that "[t]he reasonableness of [a defendant's] belief and actions in using deadly force must be judged in the light of the circumstances in which he acted at the time and is not measured by subsequently developed facts." Syl. pt. 3, *State v. W.J.B.,* 166 W. Va. 602, 276 S.E.2d 550. The reasonable belief standard "is composed of an objective element, *i.e.,* a reasonable belief that force is necessary, and a subjective element, *i.e.,* an actual belief that force is necessary." *David v. State,* 698 P.2d 1233, 1235 (Alaska Ct.App. 1985). Moreover, "a person may use only that force which is necessary in view of the nature of the attack; any use of excessive force is not justified and a homicide which results therefrom is unlawful." *People v. Clark,* 130 Cal.App.3d 371, *377,* 181 Cal.Rptr. 682, 686 (1982) (citing *People v. Young,* 214 Cal.App.2d 641, 29 Cal.Rptr. 595 (1963)).

Mrs. Cook did not initially resort to deadly force when she came to the aid of her husband. In fact, Mrs. Cook hurled her body into the onslaught and tried to pull Mr. Buckler from her husband. This degree of force, while reasonable, proved to be inadequate. Mr. Buckler knocked Mrs. Cook aside, ripping open her shirt. He then returned to beating Mr. Cook. At this point, Mrs. Cook stepped squarely into the shoes of her husband and used the degree of force her husband, if able to do so, was privileged to use. Mrs. Cook fired the shotgun only wanting to shoot Mr. Buckler in his arm to stop him from killing her husband. The evidence shows that just as the shot was fired, Mr. Buckler raised his right arm to again hit Mr. Cook. As he did so the bullet landed under his right armpit—stopping him cold. Mrs. Cook did not fire a second shot. She reloaded the shotgun when it appeared that Mr. Buckler was going to get up and again start fighting. These facts support the conclusion that Mrs. Cook used only that degree of force which was reasonably necessary to defend her husband.

In the face of this overwhelming evidence of defense of another, the State presented testimony by Mr. Buckler's son to try and counter the facts presented by Mr. and Mrs. Cook and corroborated by three eyewitnesses—Brent Clayton, Rebla Jackson and Norma Gibson. Mr. Buckler's son is twelve years old. The child was present and physically inside Mr. Buckler's truck, with his brother, at the time the incident occurred. The child testified that he heard more than he actually saw, as the altercation occurred at the rear of the truck. There was a partially opened rear window in the truck which allowed the child to see some of the events that occurred. A careful reading of the child's testimony reveals that he selectively

informed the jury of what he saw and heard. For example, on cross examination the following exchange with the child took place:

Q. Did you ever see Gerald start to walk away from your father?

A. No.

Q. You didn't see that? Did you see your father walk behind Gerald?

A. No.

Q. Did you see Gerald turn and try to push your father away?

A. No.

Q. Did you see your father pull Gerald to the ground?

A. No.

Q. Did you see your father standing over top of Gerald?

A. No.

Q. He wasn't hitting him.

A. No.

Q. You don't remember Brenda Cook saying, stop, stop, please stop?

A. No.

The manner in which the child chose to testify is understandable. The child's father was killed. However, the law cannot allow empathy for the child to sway the balance of justice. In light of the corroborated testimony of three eye witnesses we must conclude that Mrs. Cook presented sufficient evidence to force the state to have to prove beyond a reasonable doubt that she *did not* act in defense of another when she used deadly force. The state failed to carry its burden on this issue. Consequently, the conviction and sentence for second degree murder must be vacated, and the case remanded for an entry of a judgment of acquittal.[23] *See State v. Baker*, 177 W.Va. 769, 771, 356 S.E.2d 862, 864 (1987) ("In view of the fact that the defendant was entitled to a judgment of acquittal, no retrial is permitted . . .").

## IV.

### CONCLUSION

In view of the foregoing, the conviction and sentence in this case is vacated and the case is remanded for entry of a judgment of acquittal. The defendant is ordered to be released.

Vacated and Remanded.

WORKMAN, Justice, concurring:

I write separately only to emphasize that it is the rare and exceptional case in which I would embark on overturning a jury verdict in a case which appears otherwise to have been fairly tried. As Justice Cleckley so eloquently stated in *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996):

A convicted defendant who presses a claim of evidentiary insufficiency faces an uphill climb. The defendant fails if the evidence presented, taken in the light most agreeable to the prosecution, is adequate to permit a rational jury to find the essential elements of the offense of conviction beyond a reasonable doubt. Phrased another way, as long as the aggregate evidence justifies a judgment of conviction, other hypotheses more congenial to a finding of innocence need not be ruled out. We reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 303, 470 S.E.2d at 622. Succinctly stated, a reviewing court ought not overturn a jury verdict unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Justice Davis, however, has made an obviously thorough review of all the evidence and has artfully set forth why this case is that rare and exceptional one. The majority opinion outlines with great care and detail why "no rational trier of fact could have found the essential elements of the crime

---

**23.** In view of this Court's finding, we need not consider Mrs. Cook's other assignments of error.

beyond a reasonable doubt." *See LaRock,* 196 W.Va. at 303, 470 S.E.2d at 622. It is the compelling application of the law to the facts presented to the jury that leads me to the ultimate conclusion that there was an insufficiency of the evidence to support the Appellant's conviction in this case.